624 A.2d 628

NEW JERSEY DIVISION OF YOUTH AND FAMILY SERVICES, PLAINTIFF, v. J.L.

IN THE MATTER OF REDFREDDY L., A MINOR.

Superior Court of New Jersey
Chancery Division Middlesex County
Family Part

Decided February 19, 1993.

Steven J. Klein, Deputy Attorney General, for the plaintiff.

James A. Louis, Assistant Deputy Public Defender, Law–Guardian.

Marcia L. Hendler, Guardian–Ad–Litem for Redfreddy L. (Weiner, Hendler & Derman, attorneys).

PALEY, J.S.C.

On May 23, 1990, plaintiff New Jersey Division of Youth and Family Services (herein: "DYFS" or "division") sued for temporary custody of Redfreddy L.,[1] born three days earlier. The complaint and initial process were served upon the mother pursuant to the Rules of Court; she has entered no appearance.

This court appointed Marcia L. Hendler, Esquire, as guardian *ad litem* for Redfreddy, pursuant to *R*.5:8B, for the limited purposes of exploring, first, whether this court is authorized to change Redfreddy's first name and, second, whether that change is in Redfreddy's best interests. The guardian's application to change the name was heard by this court on February 19, 1993.

FACTUAL BACKGROUND:

Redfreddy L. was born on May 20, 1990, at the Robert Wood Johnson Medical Center in New Brunswick. His mother had given birth to an older boy, Abraham, in 1984. Upon his release from the hospital, Abraham was first placed in foster care and, nine months later, with maternal relatives.[2] During that entire nine month period, the mother was confined to Marlboro Psychiatric Hospital as a paranoid schizophrenic. For much of the next six years and until the present time she has remained at Marlboro.

Following Redfreddy's birth in 1990, the mother did not appear competent to make decisions for herself and the newborn. The mother had no family closer than Florida, and she was estranged from those relatives. She planned to return to the motel where she had been living prior to the birth, although she had exhausted her grant of public assistance and had no inkling of how she and the baby were to live. She had no necessary baby items, except for a stroller.

---

[1] The surname is here identified only by its initial, in the interests of confidentially.

[2] Several years ago, Abraham died in an automobile accident.

While at the hospital, she told her doctor that she wanted Redfreddy circumcised; later, she stated that she understood that she was to have been circumcised. She identified Redfreddy's "father" by name; he proved to be only a casual acquaintance who had occasionally waved to the mother through the window of the fast-food restaurant where he worked. This "identification" was apparently delusional. She further stated that she was 200 years old.

DYFS concluded that the mother's history of mental illness and her apparent inability to care for the infant compelled it to act. Therefore, upon Redfreddy's birth, DYFS filed its complaint for custody and related relief, citing both *N.J.S.A.* 9:6–8.21 *et seq.* and *N.J.S.A.* 30:4C–12 as appropriate authority. After DYFS removed the baby, the mother was committed to Marlboro Psychiatric Hospital where, as noted, she remains.

Redfreddy was placed in a foster home, where he remained for more than two years. In mid–1992, Redfreddy's Florida relatives informed DYFS that they wished to accept him into their home; he was placed there in early February, 1993. Both his foster parents and his Florida relatives have always called him "Andrew". The foster parents asked DYFS to consider changing his name to "Andrew Frederick" some time ago, but DYFS and the Law Guardian were unsure of their capacity to seek such relief in the courts. .

LEGAL ANALYSIS:

■ This court has concluded that it may change the name of a child who is the subject of a DYFS proceeding, consistent with the child's best interests. This court has no doubt that Redfreddy's best interests require the guardian ad litem to institute an appropriate proceeding pursuant to *N.J.S.A.* 2A:52–1, *et seq.*, to permit Redfreddy to be known as Andrew Freddy L.

DYFS sues under *N.J.S.A.* 9:6–8.21, a definitional section, which defines an "abused or neglected child" as follows, in pertinent part:

c. "Abused or neglected child" means a child less than 18 years of age ... (4) whose physical, mental, or emotional condition ... is in imminent danger of becoming impaired as the result of the failure of his parent ... to exercise a minimum degree of care (a) in supplying the child with adequate food, clothing, shelter, education, medical or surgical care though financially able to do so or though offered financial or other reasonable means to do so, or (b) in providing the child with proper supervision or guardianship ...

This section must be read in conjunction with *N.J.S.A.* 9:6–8.22, its immediate successor, which gives to this court "jurisdiction over all noncriminal proceedings involving alleged cases of child abuse or neglect ...", and charges this court "with the immediate protection of [allegedly abused or neglected] children." The court is given an assortment of tools helpful in discharging this responsibility, including the temporary removal of the child from home, per *N.J.S.A.* 9:6–8.28(a); the entry of an order authorizing a physician or hospital to perform emergency medical or surgical procedures before hearing, in specified instances, per *N.J.S.A.* 9:6–8.28(c); preliminary placement, per *N.J.S.A.* 9:6–8.31; and mandatory medical examinations, per *N.J.S.A.* 9:6–8.31(g). Following a "fact-finding hearing" to determine whether the child is an abused or neglected child [*N.J.S.A.* 9:6–8.44], the court "may refer any aspect of the matter, including *anything related to the child* and the parent or guardian, to the division, ordering that the division provide such services as are deemed appropriate to the ends of protecting the child and rehabilitating and improving family life, wherever possible." *N.J.S.A.* 9:6–8.50 (emphasis added). The court may release the child to a parent or guardian, place the child with a relative or other suitable person, restrict contact between the child and particular adults, order probation supervision, and provide for therapeutic services. See *N.J.S.A.* 9:6–8.55, *et seq.*

■ It is hard to imagine a broader grant of authority. Changing a child's name is certainly "related to the child" and, under certain circumstances, as in the case of a name plainly ridiculous, may be seen as "protecting the child". Title 9, therefore, is authority for the relief sought here.

*N.J.S.A.* 30:4C–12, the second statute relied upon by DYFS, authorizes the filing of a complaint by DYFS whenever

... it shall appear that the parent ... is unfit to be entrusted with the care and education of such child, or shall fail to provide such child with proper protection, maintenance, or education, or is endangering the welfare of such child ...

DYFS is further authorized to investigate the circumstances justifying the complaint, including the "social history" of the child. The court may enter an order permitting an investigation, even over objection of the parent or custodian, or may proceed in a summary manner, "if satisfied that the best interests of the child so require," all with the intent of making the child a ward of the court and placing such child under the supervision of DYFS. *N.J.S.A.* 30:4C–12. The hearing is designed to produce an order addressing the "care" of the child; that term is defined as the "cognizance of a child for the purpose of providing necessary welfare services, or maintenance, or both". *N.J.S.A.* 30:4C–2(c). "Welfare services", in turn, is defined as counseling and consultation "for the purpose of determining and correcting or adjusting matters and circumstances which are endangering the welfare of a child, and for the purpose of promoting his proper development and adjustment in the family and the community." *N.J.S.A.* 30:4C–2(g).

This grant of authority clearly suggests that the court's central inquiry must address the best interests of the child; indeed, the term "best interests" is specifically used, as quoted above. Cf. *Fantony v. Fantony,* 21 *N.J.* 525, 122 *A.*2d 593 (1956); *Hoy v. Willis,* 165 *N.J.Super.* 265, 398 *A.*2d 109 (App.Div.1978); *Brotman v. Brotman,* 137 *N.J.Eq.* 514, 45 *A.*2d 667 (E. & A.1946). The statute's references to social history and to the child's development and adjustment in its family and community suggest that the scope of the inquiry should be wide. As with *N.J.S.A.* 9:6–8.21, the Family Court may take any action consonant with the best interests of the child under *N.J.S.A.* 30:4C–12.

Having found authority for the grant of the relief sought under their statue, the court must now determine whether the name change conforms to Redfreddy's best interests.

The court is sensitive to the delicate nature of the matter. The Family Court regularly sees names from a wide variety of ethnic heritages and linguistic sources. A typical day's calendar includes names of Coptic, Arabic, Hebrew, Filipino, Chinese, African, Anglo–Saxon, Hispanic, and other, origin. It should go without saying that merely because a name may sound "foreign" or "odd" to the court, the court should not intervene. This court would not, for example, convert the name "Shaquanna" to the name "Jennifer" simply because "Jennifer" is more "standard" (whatever that means), more "American", or more tasteful. There is, after all, no accounting for tastes. But then there comes "Redfreddy".

"Redfreddy" is a striking name. Nothing before the court provides even a remote clue as to its derivation. What is clear is that the name was the brainchild of someone markedly ill. It is easy to foresee that Redfreddy will be ridiculed by his schoolmates once they learn his "real" name. This name has never been used to identify this particular child; indeed, he may not be aware of it at all. As noted, his parents-in-placement call him "Andrew".

How could any person not be struck by the difficulties of the first two years of this child's life? Born to a profoundly ill woman, separated from his mother at birth, placed with foster parents in New Jersey, transported to Florida to live with virtual strangers, having little or no likelihood of ever experiencing meaningful contact with his mother, the child has known almost every disadvantage. The court will not compound this succession of misfortunes by leaving intact a circumstance guaranteed to produce problems for the child in the future.

The court has broad discretion regarding a name change. *K.K. v. G,* 219 *N.J.Super.* 334, 530 *A.*2d 361 (Ch.Div.1987); *In re Fisher,* 204 *N.J.Super.* 75, 497 *A.*2d 907 (Law Div., 1985). In *K.K. v. G., supra,* the court permitted a six-year-old child to add the last name of her stepfather to her surname because she identified with her stepfather and perceived herself as belonging to his family and already bearing his name. There, the court acted to

reinforce a child's identity; here, similarly, the child is already called by the new name.

Absent improper or fraudulent intent, a person may adopt any name, even without using the statutory procedure set forth in *N.J.S.A.* 2A:52–1. Redfreddy is of insufficient age to express any meaningful preference. *In Re Fisher, supra,* 204 *N.J.Super.* at p. 79. His guardian *ad litem* has requested, on his behalf, that his legal name be changed to his identifying name. At common law, anyone could adopt whatever name he or she wished without formal action. *Plank v. Plank,* 241 *N.J.Super.* 543, 575 *A.*2d 537 (Ch.Div.1990), *overruled, Cimiluca v. Cimiluca,* 245 *N.J.Super.* 149, 584 *A.*2d 823 (App.Div., 1990). Our courts have granted the right to use a desired name to a son whose mother wished to change the son's surname to hers, *Application of Rossell by Yacono,* 196 *N.J.Super.* 109, 481 *A.*2d 602 (Law Div. 1984); to a divorcing spouse, *Cimiluca v. Cimiluca, supra,* and to a divorced spouse, *Olevich v. Olevich,* 258 *N.J.Super.* 344, 609 *A.*2d 528 (Ch.Div.1992). And now, to a neglected child.

The guardian *ad litem* shall prepare, file, and serve an amendment to the complaint filed in this matter, which will request that, pursuant to *N.J.S.A.* 2A:52–1, *et seq.,* the child shall be known by the name "Andrew Freddy L." Following the obtaining of judgment awarding such relief, the guardian ad litem will obtain a corrected birth record. Upon the proper filing of that document, the guardian *ad litem* may be discharged, with the appreciation of the court.