723 A.2d 1244 (1999)
Miriam BARREIRO and Jose Barreiro, Administrators ad prosequendum and General Administrators of the Estate of Jose Manuel Barreiro, deceased, Plaintiffs-Appellants,
v.
Christopher N. MORAIS, Frank Hoffman, Wahid A. Ibrahim, and St. James Hospital, a hospital corporation, Defendants-Respondents.
Superior Court of New Jersey, Appellate Division.
Argued November 17, 1998.
Decided February 23, 1999.
*1245 Lewis Stein, Succasunna, for plaintiffs-appellants (Nusbaum, Stein, Goldstein & Bronstein, attorneys; Mr. Stein, on the brief).
JoAnn B. Pietro, for defendant-respondent Frank Hoffman, M.D. (Ruprecht, Hart & Weeks, Milburn, attorneys; David F. Soltero, Livingston, on the brief).
George J. Kenny, Roseland, for defendants-respondents St. James Hospital and Wahid A. Ibrahim, M.D. (Connell, Foley & Geiser, attorneys; Mr. Kenny, of counsel; Ernest W. Schoellkopff, on the brief).
Paul J. Giblin, Jr., Oradell, for defendant-respondent Christopher N. Morais, M.D. (Giblin & Giblin, attorneys; Mr. Giblin, joins in the brief of respondents St. James Hospital and Wahid A. Ibrahim, M.D.).
Before Judges MUIR, Jr., KEEFE, and COBURN.
PER CURIAM.
Plaintiffs appeal from an order dismissing with prejudice their medical malpractice complaint for failure to comply with the Affidavit of Merit Statute, N.J.S.A. 2A:53A-27. The trial court's order was entered after our opinion, but before the Supreme Court's opinion, in Cornblatt v. Barow, 303 N.J.Super. 81, 696 A.2d 65 (App.Div.1997), rev'd, 153 N.J. 218, 708 A.2d 401 (1998). Plaintiff raises the following contentions:
POINT I
SINCE (1) THE PURPORTED BENEFIT OF EARLY TERMINATION OF SUITS IS ILLUSORY, (2) THE STATUTE IS ESSENTIALLY DIRECTED TOWARD MEDICAL NEGLIGENCE AND HAS LITTLE APPLICATION TO THE OTHER NAMED PROFESSIONS AND (3) EFFECTS MAJOR CHANGES IN THE PROOFS REQUIRED TO ESTABLISH A CAUSE OF ACTION AT TRIAL, N.J.S.A. 2A:53A-26 TO 29 IS UNCONSTITUTIONAL ON SUBSTANTIVE DUE PROCESS AND EQUAL PROTECTION GROUNDS UNDER THE NEW JERSEY CONSTITUTION.
POINT II
THE CERTIFICATE OF MERIT STATUTE CONTRAVENES THE DOCTRINE OF SEPARATION OF POWERS AND IS IN CONFLICT, EITHER DIRECTLY OR BY NECESSARY IMPLICATION WITH THE RULES OF PROCEDURE PROMULGATED BY THE SUPREME COURT PURSUANT TO THE AUTHORITY DELEGATED TO IT UNDER THE CONSTITUTION.
POINT III
THE PROPER CONSTRUCTION OF N.J.S.A. 2A:53A-29 REQUIRES A FINDING THAT ANY DISMISSAL BE "WITHOUT PREJUDICE."
We reject the contentions raised. Nonetheless, the circumstances demonstrated in the record before us suggest extraordinary circumstances, see Cornblatt, supra, 153 N.J. at 245, 708 A.2d 401, which would have dictated a dismissal without prejudice before the tort statute of limitations ran. Plaintiff did not have the opportunity to present evidence on the issue of extraordinary circumstances. Consequently, we vacate the order under appeal and remand for a hearing on that issue. We rely on documents in the record for the factual backdrop.

I
Jose Manuel Barreiro (Barreiro), plaintiffs' son, died March 29, 1996. He was 20 years old. The cause of death was brain stem herniation due to subarachnoid hemorrhage.
Barreiro's medical history prior to his death is reflected in a University Hospital Discharge Summary. Defendant St. James Hospital transferred Barreiro to University Hospital after he went into a deep coma. During the two weeks prior to his admission to St. James, Barreiro experienced flu-like symptoms, vomiting, diarrhea, abdominal *1246 pain, and dizziness. Barreiro, three days prior to admission, had trouble walking because he could not keep his balance.
Two days prior to his admission to St. James, Barreiro saw defendant Dr. Christopher N. Morais, his family doctor. Dr. Morais gave a diagnosis of gallbladder infection. The doctor advised hospital admission for abdominal ultrasound and prescribed Compazine PO.
The next day, March 22, Barreiro experienced severe headache, dizziness, vomiting, and inability to walk. He was taken to the St. James emergency room. Defendant Dr. Wahid A. Ibrahim was the emergency room doctor at the time. At 7:45 a.m., hospital personnel conducted a gallbladder ultrasound. At 8:15 a.m., a CT scan was taken. Clinical examinations were made. Hospital personnel gave Barreiro intramuscular injections. As the result of the CT scan, there was an assessment of obstructive hydrocephalus. An MRI was recommended. When Barreiro vomited in the emergency room, emergency room personnel gave him another intramuscular injection.
At some point, Barreiro's father called the nurse to assess his son due to shallow breathing and unresponsiveness. A code was called. At 12:35 p.m., emergency room personnel intubated Barreiro and transferred him to the Intensive Care Unit. The hospital report afforded an extremely guarded prognosis.
On March 23, at 2:45 p.m., Barreiro's pupils were non-reactive. By 3 p.m., Barreiro was in a deep coma. A repeat CT scan showed obstructive hydrocephalus with cerebral edema and a small subarachnoid hemorrhage around the brain stem with brain stem herniation.
On March 24, Barreiro was admitted to University Hospital. At that time, there was no evidence of clinical brain stem function or corticalis. University Hospital records disclosed the etiology of the coma was "unclear" except to note the CT scan showed hydrocephalus. At that point, surgical intervention was deemed unnecessary. The University Hospital apparently kept Barreiro on life support systems until 11:20 a.m. on March 29, when he was pronounced dead.
Plaintiffs engaged counsel[1] on April 25, 1996. Counsel began an investigation on May 1, 1996. He sent letters to St. James requesting hospital records related to Barreiro's hospitalization. The hospital responded on May 9 that it had "no listing in [its] files for the dates being requested." Counsel sent further letters on May 9 and May 24 requesting pertinent hospital records. On June 10, counsel requested CT scan films from St. James.
That same day, plaintiffs' counsel forwarded the St. James Hospital chart to Dr. Richard Defendini, Professor of Neuropathology at Columbia Presbyterian College of Physicians and Surgeons. It is not clear from the record when counsel received the chart from St. James. Three days later, at Dr. Defendini's request, counsel wrote to University Hospital asking it to give the doctor an opportunity to examine certain physical evidence from Barreiro's autopsy.
On June 27, counsel provided Dr. Defendini with plaintiffs' historical statement and copies of the CT scans. In the same letter, counsel noted he would forward the autopsy materials when made available.
On June 28, 1996, plaintiffs filed the complaint in this matter. On August 2, defendants St. James Hospital and Dr. Ibrahim filed their answer. In the answer defendants reserved "the right to move to dismiss the Complaint on the grounds that the cause of action alleged therein is bound or proscribed by the provisions of N.J.S.A. 2A:53A-7 & 8." Simultaneously, those defendants served interrogatories, a notice to take depositions, and a demand for production of documents.
The St. James Hospital records proved to be indecipherable. Dr. Defendini sought clarification and explanation. On or about August 21, 1996, counsel wrote to defense counsel for St. James requesting the "translation" of the notes. On October 17, counsel, in writing, reminded defense counsel of the need for translation. Defense counsel forwarded the translation on December 16, *1247 which counsel then forwarded to Dr. Defendini.
In the interim, several other relevant events occurred. On September 10, counsel sent Dr. Defendini complete medical records "recently received" from University Hospital. On September 30, defendant Dr. Morais filed an answer and served interrogatories. The answer made no reference to the Affidavit of Merit Statute. On November 18, defendant Dr. Frank Hoffman served his answer, which similarly made no reference to the Affidavit of Merit Statute. The parties also exchanged discovery requests and discovery information. In his discovery demand, Dr. Hoffman requested plaintiff provide an Affidavit of Merit.
On January 28, 1997, Dr. Defendini found particular facets of St. James Hospital records still indecipherable. As a result, counsel wrote to St. James' defense counsel requesting "a `transcription of handwriting' as soon as is reasonably possible." The request related to admitting history, body system review, and physical examination records.
It was not until March 11, 1997, that defense counsel for St. James forwarded "Dr. Ibrahim's transcription of his own entries in the chart and neuro & vital observation sheets with transcribed names of the nurses who signed those sheets." In the same letter, defense counsel requested answers to interrogatories and an Affidavit of Merit within one week. Counsel forwarded the transcriptions to Dr. Defendini on March 20, 1997. On the same date, counsel advised St. James' defense counsel the plaintiffs' expert's report was not anticipated until the end of April. Defense counsel for St. James thereafter filed a motion to dismiss for failure to answer interrogatories. An order dismissing the complaint against St. James and Dr. Ibrahim ensued. The remaining parties continued to schedule discovery.
On May 19, 1997, counsel forwarded Dr. Defendini's report and his curriculum vitae to all defense counsel. The report, in extensive detail, concluded the doctors who cared for Jose Manuel Barreiro were professionally incompetent and negligent.
On May 21, 1997, plaintiffs received a motion of defendants St. James Hospital and Dr. Ibrahim to dismiss for failure to comply with N.J.S.A. 2A:53A-27. On July 31, 1997, the trial court granted the motion after oral argument based on papers filed, which included certifications by counsel and by movants' defense counsel. The ensuing order dismissed the entire complaint with prejudice. Plaintiffs then filed this appeal.

II
We turn first to the constitutional objections to the statute. Similar objections were raised for the first time before the Supreme Court in Cornblatt, supra, 153 N.J. at 247-48, 708 A.2d 401. The Court elected not to decide the issues. The Court did "note in passing" that neither equal protection nor due process poses a substantial threat to the statute's validity. Ibid. The Court further observed the separation of powers doctrine is not implicated by the statute. Id. at 248, 708 A.2d 401. We recognize these rulings are dictum. Nonetheless, we consider ourselves bound by them.
Professor Wright has postulated criteria useful to evaluate the dictum in Cornblatt. "Much depends upon the character of the dictum. Mere obiter may be entitled to little weight, while a carefully considered statement... though technically dictum, must carry great weight, and may even ... be regarded as conclusive." 1 Charles A. Wright, The Law of Federal Courts § 58 at 374 (4th ed.1983). The Cornblatt dictum, although expressed in "passing" terms, was more than casually constructed. It has more substance than mere obiter. It has the attributes of carefully considered dictum.
As an intermediate appellate court, we consider ourselves bound by Cornblatt`s carefully considered dictum in the same manner as its outright holdings. See State v. Rush, 46 N.J. 399, 416, 217 A.2d 441 (1966). To undergird that reasoning, we highlight the careful analysis afforded and its very recent application to the same statute. Consequently, relying on the Cornblatt dictum and for the reasons expressed by it, we reject the plaintiffs' claims the statute is unconstitutional.

*1248 III

Cornblatt also disposes of plaintiffs' remaining contention that any dismissal under the statute be without prejudice. Generally, a dismissal for failure to timely file an Affidavit of Merit is with prejudice. Cornblatt, supra, 153 N.J. at 242, 708 A.2d 401. However, Cornblatt creates an exception. The dismissal will be without prejudice when extraordinary circumstances justify such a disposition. Id. at 247, 708 A.2d 401. It is this exception that requires the remand.
Due to the fact this case arose between our decision in Cornblatt and that of the Supreme Court, the extraordinary circumstances issue was not raised in the trial court. Generally, this court will not consider an issue if the record before the court is not complete on the issue. See Cornblatt, supra, 153 N.J. at 230, 708 A.2d 401. Here, although the trial court to some degree anticipated that issue in its ruling, plaintiffs could not have foreseen the need, and consequently did not have the opportunity, to present a factual basis upon which a claim of extraordinary circumstances could be considered. Therefore, we remand to afford that opportunity consistent with this opinion.
The Affidavit of Merit Statute provides malpractice defendants with a shield against meritless litigation. As the Supreme Court noted in In re Hall, 147 N.J. 379, 391, 688 A.2d 81 (1997), "[t]he legislative history pertinent to the Affidavit of Merit Statute supports the conclusion that its purpose was to require plaintiffs in malpractice cases to make a threshold showing that their claim is meritorious, in order that meritless lawsuits readily could be identified at an early stage of litigation." Consonant with that purpose, the statute requires a plaintiff to file an Affidavit of Merit "within 60 days following the date of filing of the answer to the complaint by the defendant." N.J.S.A. 2A:53A-27. A plaintiff, however, has a window of opportunity for an additional 60 days if the court finds good cause for extension. N.J.S.A. 2A:53A-27; see also Hall, supra, 147 N.J. at 391-92, 688 A.2d 81. Consequently, the statute allows a plaintiff a maximum of 120 days in which to file the affidavit.
The purpose of the statute, however, is not to afford malpractice defendants with a sword to fight off a malpractice action by procrastinating in providing records and other relevant materials that a competent, conscientious expert would have to analyze before submitting an Affidavit of Merit. There can be no dispute that licensed professionals envision malpractice litigation as an anathema. Human nature being what it is, a malpractice litigant would not enthusiastically furnish the records necessary for expert review. Indeed, as the statutory clock ticks against a plaintiff, procrastination, subtle or otherwise, could be used as a sword to prevent a valid malpractice claim from reaching the courtroom.
The Legislature, in part, recognized the potential for such intransigency by the malpractice defendant when it created the in lieu of affidavit procedure under N.J.S.A. 2A:53A-28. That procedure affords a plaintiff a vehicle to prevent a malpractice defendant from defeating a malpractice claim prematurely by failing to provide the data necessary for an expert to render an Affidavit of Merit. If 45 days have passed after a plaintiff has submitted a properly addressed request to defendant and "defendant has failed to provide plaintiff with medical records or other records or information having a substantial bearing on preparation of the affidavit," plaintiffs are permitted to file a sworn statement in lieu of the affidavit. N.J.S.A. 2A:53A-28; see also Hall, supra, 147 N.J. at 390, 688 A.2d 81.
However, an educated malpractice defendant may, though subtly, induce a plaintiff into believing there is no need to comply with the "in lieu of" procedure. The defendant may agree to supply the required information but simply fail to provide it in a diligent and timely manner, thereby allowing the statutory clock to run out. Consequently, the statute's time limits may become a sword in the hand of a defendant so that a meritorious claim escapes exposure to the litigation process. We view the extraordinary circumstances exception, in part, as a means of preventing the shield from being transformed to a sword.
*1249 The Cornblatt Court, in effectuating the extraordinary circumstances exception, imputed the legislative intent for its implementation. Cornblatt, supra, 153 N.J. at 247, 708 A.2d 401. In doing so, it relied upon the holdings of Hartsfield v. Fantini, 149 N.J. 611, 695 A.2d 259 (1997), and its companion case, Wallace v. JFK Hartwyck at Oak Tree, Inc., 149 N.J. 605, 695 A.2d 257 (1997). In Hartsfield, despite statutory language mandating statute-created causes of action be initiated within fixed time limits, the Court permitted relaxation of the time limits upon showing the failure to meet the time limits was due to "`extraordinary circumstances.'" Hartsfield, supra, 149 N.J. at 618, 695 A.2d 259. The Hartsfield Court noted, "[w]hat constitutes an `extraordinary circumstance' will require a fact-sensitive analysis...." Ibid.
Here, the trial court cited Hartsfield when it found, on the basis of the record before it, "no extraordinary circumstances which would justify relaxing the time limits of the statute." While that finding exhibited prescience on the court's part, we conclude the finding cannot be controlling in this instance given plaintiffs' lack of opportunity to present proofs as noted. While Hartsfield identifies the standard, it does not afford an answer whether such circumstances occurred here. Only a plenary hearing on remand will resolve that issue.
Defendants St. James and Dr. Ibrahim nevertheless argue that the expiration of the 120 days in this instance mandates the dismissal with prejudice. Essentially, they argue the expiration of 120 days is a bright line beyond which extraordinary circumstances cannot apply. We reject that contention. Adoption of the argument would make the exception meaningless. Beyond that, it would provide malpractice defendants who are aware of the statute, such as defendants here, with the ability to use the statute improperly as a sword. We are satisfied the extraordinary circumstances exception engrafted on the statute by the Cornblatt Court requires the remand for a hearing to prevent such an occurrence.
At the remand hearing, the facts asserted in the record before us must be explored. Those facts provide the structure for the proofs to be taken. The record discloses plaintiffs requested hospital records prior to the filing of the complaint but were initially rebuffed. Thereafter, they made an August 21, 1996, request for translation of the illegible or indecipherable records the hospital had finally provided. Again, despite an October 17 reminder requesting the translations, the defendants did not provide the translations until December 16, 1996, more than 130 days after they filed their answers. Even then, Dr. Defendini needed further translations. What caused those delays which ultimately made the statutory clock expire is not clear.
We note parenthetically, in a profession somewhat notorious for its indecipherable handwriting, reason dictates hospitals should require prompt typing of notes, particularly when the patient dies during a hospitalization. Certainly, the protracted delays and lack of prompt production of legible documents entitles the fact finder to draw inferences consonant with the sword analogy previously discussed.
At the hearing plaintiffs will have the opportunity to establish the facts projected by the record before us. They will be given the opportunity to present proofs that the hospital records were indecipherable. Once that indecipherable nature is established, Dr. Defendini will be afforded the opportunity to prove the indecipherable documents had a substantial bearing on his preparation of the affidavit and prevented him from doing so in a timely fashion. Assuming the evidence presented demonstrates, by its preponderance, such an obstacle to the submission of an Affidavit of Merit, the trial court must determine whether the delays asserted in the record before us did in fact occur. Those proofs, and other relevant facts, must then be considered by the court to determine whether extraordinary circumstances existed to justify a dismissal without prejudice.
In the event the court concludes extraordinary circumstances existed, plaintiffs shall be afforded such time, from the ensuing order dismissing the complaint without prejudice, to file a new complaint with an appropriate *1250 Affidavit of Merit as if the statute of limitations had been tolled when the order under appeal was entered. By our calculation, that would allow plaintiffs a little over six months to file the properly authenticated complaint.
The order under appeal is reversed. The matter is remanded for a hearing consistent with this opinion.
Reversed.
NOTES
[1] "Counsel" hereafter refers to plaintiffs' attorney.