35 A.3d 684

PAUL EMMA, PLAINTIFF–APPELLANT, v. JESSICA
EVANS, DEFENDANT–RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued October 18, 2011—Decided January 20, 2012.

Before Judges FISHER, BAXTER and NUGENT.

*Richard F. Klineburger, III,* argued the cause for appellant (*Klineburger & Nussey,* attorneys; *D. Ryan Nussey,* on the brief).

*Lynda M. Yamamoto* argued the cause for respondent (*Law Office of Jan R. Evans,* attorneys; *Jan R. Evans,* on the brief).

The opinion of the court was delivered by

FISHER, J.A.D.

"What's in a name?" [1]  In this appeal, we examine the propriety of a presumption in favor of the parent of primary residence [2] when seeking, over the other parent's objection, a change in the surname of their two children.  In two cases—*Ronan v. Adely,* 182 *N.J.* 103, 861 *A.*2d 822 (2004) and *Gubernat v. Deremer,* 140 *N.J.* 120, 657 *A.*2d 856 (1995)—the Court authorized application of a presumption in the PPR's favor in name-change disputes when the child was born out of wedlock.  In this matter of first impression, we reject the adoption of such a presumption when the child was born in wedlock to parents who subsequently divorce.

The parties married in 1999 and children were born to the marriage in 2006 and 2007; at birth they were given their father's surname.  The parties separated in late 2008 and a judgment of divorce, which incorporated a property settlement agreement

---

[1] William Shakespeare, *Romeo and Juliet,* Act II, sc. 2.

[2] The parties and some of the cases cited herein refer to the parent with whom the children spend the greater portion of their time as the primary custodial parent or other similar names.  To avoid confusion, we will refer to that parent as the parent of primary residence (PPR), by using the nomenclature adopted in the child support guidelines.  *See* Pressler and Verniero, *Current N.J. Court Rules,* Appendix IX–B to *R.* 5:6A at 2519 (2012).

(PSA), was entered on January 21, 2010. The parties agreed in the PSA that they would exercise joint legal custody; Jessica was designated "the primary residential/physical custodian" and Paul was designated "the alternate residential parent." The original parenting schedule called for the children to reside with Paul on alternating weekends, as well as overnight visits every Thursday night to Friday morning, and four hours each Tuesday evening.

In late 2010, Paul filed a motion, seeking an alteration in the parenting schedule. As relevant to the appeal, Paul also asserted that Jessica had unilaterally attempted to alter the children's surname, providing evidence that school records and health insurance information identified the children's surname as "Evans–Emma"; he sought an order directing Jessica to cease any unilateral modifications of the children's surname. Paul also claimed this change had not been discussed, as would have been expected because the PSA called for joint legal custody; his communications demanding a return to the status quo were not heeded. Jessica cross-moved, seeking, among other things, a change of the children's surname "from Emma to Evans." Paul responded, arguing that the children were born while the parties were married and were then given the surname Emma, that there was no principled reason for a change in that status, and that any change could only occur by following the statutory procedure.

The trial judge rejected Paul's arguments and entered an order changing the children's surname to Evans. Paul appealed, arguing, first, that our jurisprudence does not establish a presumption in favor of a PPR's choice of surname when children are born in wedlock. We agree.

I

A

In its landmark decision in *Gubernat,* the Court considered the principles to be applied by a court in resolving disputes about a child's surname between unmarried parents. The child in *Guber-*

*nat* was born out of wedlock and given the mother's surname. *Id.* at 123, 657 *A.*2d 856. The father refused to acknowledge paternity but in subsequent legal proceedings was found to be the biological father and permitted visitation. *Ibid.* Later, the father was provided with additional parenting time and an order was entered awarding joint legal custody, while the mother maintained physical custody of the child for the majority of the time. *Id.* at 125, 657 *A.*2d 856. The trial court also ordered that the child assume the father's surname. *Ibid.* The mother appealed the name change and we affirmed. *Id.* at 125–26, 657 *A.*2d 856.

In reversing, the Supreme Court recognized that "Western custom and law spanning more than six centuries" favored a preference for paternal surnames, *id.* at 122, 657 *A.*2d 856, but the Court also determined that, as progress shifted toward marital and parental equality, society had evolved to a point that it is now " 'purportedly neither maternal nor paternal,' " *id.* at 137, 657 *A.*2d 856 (quoting *K.K. v. G.*, 219 *N.J.Super.* 334, 337, 530 *A.*2d 361 (Ch.Div.1987)), and concluded that a best-interests-of-the-child standard must be applied "in determining the appropriate surname to be given to a child, regardless of the child's birth status," *id.* at 139, 657 *A.*2d 856. The Court held that the factors to be considered in applying this best-interests standard include

the length of time that the child has used one surname, the identification of the child as a member or part of a family unit, the potential anxiety, embarrassment, or discomfort the child might experience if the child bears a surname different from the custodial parent, and any preferences the child might express, assuming the child possesses sufficient maturity to express a relevant preference.

[*Id.* at 141, 657 *A.*2d 856.]

Moreover, citing the potential for unpredictability in the application of these general considerations, *id.* at 142, 657 *A.*2d 856, the Court adopted "a strong presumption in favor of the surname chosen by the custodial parent," *id.* at 144, 657 *A.*2d 856. In defining the phrase "custodial parent," the Court referred to the presumption as belonging to "the parent who exercises physical custody or sole legal custody." *Ibid.*

More recently, the Court summarized its holding in *Gubernat* in the following way:

> [W]e concluded that gender-based presumptions should play no part in a child's surname and that in resolving disagreements between parents concerning a child's surname, "we apply the best-interests-of-the-child standard." This standard applies whether the child is born in or out of wedlock. We explained that "[t]he preservation of the paternal bond is not and should not be dependent on the retention of the paternal surname."

> [*Ronan, supra*, 182 *N.J.* at 108, 861 *A.*2d 822 (quoting *Gubernat, supra*, 140 *N.J.* at 139, 141, 657 *A.*2d 856).]

In *Ronan*, the parents were unmarried but, when Ronan became pregnant, the parties engaged in counseling and agreed with their counselor's recommendation that they live together. *Id.* at 104, 861 *A.*2d 822. When the child was born, the parties gave the child Adely's surname. *Ibid.* Their relationship, however, soon deteriorated; Ronan and the child moved out of the home approximately one year after the child's birth. *Id.* at 105, 861 *A.*2d 822. In family court proceedings, the judge awarded joint legal custody and allowed Adely four hours visitation on Saturdays at Ronan's residence. *Ibid.* A few months later, when the child was approximately two years old, Ronan unsuccessfully moved for an order permitting a change of the child's surname from Adely to Adely Ronan. *Ibid.* After additional proceedings not relevant here, Ronan appealed the order denying her request to change the child's surname. *Id.* at 106, 861 *A.*2d 822. We affirmed. *Id.* at 106–07, 861 *A.*2d 822.

In reversing, the Supreme Court found error in the failure of the trial court and this court to consider "the presumption in favor of the primary caretaker's choice of surname." *Id.* at 111, 861 *A.*2d 822. In this regard, the Court found relevant the length of time the child utilized one surname, *id.* at 110–11, 861 *A.*2d 822, but found error in the placing of "the burden of proof upon [Ronan], the primary caretaker, to demonstrate that the name change she sought was in the best interests of [the child]," determining that

[t]he correct analysis is that there is a presumption in favor of the primary care-taker, here [Ronan], that the surname chosen by her is in the best interests of the child. [Adely] bears the burden to rebut that presumption.

[*Id.* at 111, 861 *A.*2d 822.]

## B

Against this backdrop we consider Paul's contention that no presumption ought to exist in the PPR's favor where—unlike the facts in both *Gubernat* and *Ronan*—the parties were previous-ly married and the children born in wedlock. We agree with Paul's contention that such a presumption should not be imposed when children were assigned a surname by their married parents at birth. We reach this conclusion for a number of reasons.

First, we are unable to conclude, as Jessica argues, that the Court's references in *Gubernat* and *Ronan* to children born in wedlock in explaining the scope of the best-interests test also encompassed an intent to apply a presumption in favor of the PPR in such disputes. That is, it is true the Court imposed a best-interests standard regardless of whether the child's parents were married at the time of birth. In *Gubernat,* the Court held that the best-interests standard applies "regardless of the child's birth status." *Gubernat, supra,* 140 *N.J.* at 139, 657 *A.*2d 856. And in its later decision, the Court again declared that the best-interests standard applies "whether the child is born in or out of wedlock." *Ronan, supra,* 182 *N.J.* at 108, 861 *A.*2d 822.

Certainly, the Court's determination that the best-interests standard applies regarding the surname of a child born *in wedlock* constituted dictum—because the parties in those cases had never married. It is dictum, however, that we are bound to apply. *See Lehigh Valley R.R. Co. v. Chapman,* 35 *N.J.* 177, 187, 171 *A.*2d 653 (holding that dictum of the state's court of last resort is "entitled to great weight"), *cert. denied,* 368 *U.S.* 928, 82 *S.Ct.* 364, 7 *L.Ed.*2d 192 (1961); *State v. Breitweiser,* 373 *N.J.Super.* 271, 283, 861 *A.*2d 176 (App.Div.2004) (recognizing that the Appellate Division "consider[s] [itself] bound by carefully considered dictum from the Supreme Court"), *certif. denied,* 182 *N.J.* 628, 868 *A.*2d

1031 (2005); *Barreiro v. Morais,* 318 *N.J.Super.* 461, 468, 723 *A.*2d 1244 (App.Div.1999) (holding that although earlier Supreme Court rulings on a subject constituted dictum, "we consider ourselves bound by them").

But the Court's discussion regarding the broad reach of the best-interests standard does not appear to us to encompass a mandate that the presumption in favor of the PPR must be applied regardless of whether the child was born in or out of wedlock. That is, the Court declared only that the best-interests test applied regardless of the child's birth status; the Court did not make a similar declaration when adopting a presumption in favor of the surname chosen by the PPR. And there is nothing else about the discussion of the issues in those cases that would suggest the Court implicitly intended application of the presumption when the child was born in wedlock. As a result, we view this particular question as one of first impression [3] and our disposition ungoverned by either case.

Second, we reject the application of a presumption in favor of the PPR in this setting because the presumption adopted in *Gubernat* and *Ronan* has been rejected elsewhere. Other states that have adopted a gender-neutral approach in name-change disputes between parents have not applied a presumption in the PPR's favor when the child was born to a married couple. For example, the Vermont Supreme Court rejected the application of a presumption in the PPR's favor in circumstances similar to those presented here, recognizing that "[t]he parents gave the children their father's surname, Wilson, at birth and subsequently taught them that their name was Wilson" and that, in determining whether it was in the best interests of the children to make a change, courts should resort to "gender-neutral" principles that

---

[3] The only other reported decisions since *Gubernat* that have considered applications regarding the original naming or a name change involved children born out of wedlock. *See Staradumsky v. Romanowski,* 300 *N.J.Super.* 618, 619, 693 *A.*2d 556 (App.Div.), *certif. denied,* 151 *N.J.* 467, 700 *A.*2d 879 (1997); *J.S. v. D.M.,* 285 *N.J.Super.* 498, 499, 667 *A.*2d 394 (App.Div.1995).

prohibited exaltation of the PPR's preference. *In re Wilson*, 162 *Vt.* 281, 648 *A.*2d 648, 650 (1994); *accord In re Marriage of Schiffman*, 28 *Cal.*3d 640, 169 *Cal.Rptr.* 918, 620 *P.*2d 579, 583–84 (1980) (recognizing that a best-interests test, which did not include a presumption in favor of either party, applied to contests between divorced parents as to a change in the surname of their children); *Leadingham v. Smith*, 56 *S.W.*3d 420, 425–26 (Ky.Ct.App.2001) (applying to disputes between divorced parents the same best-interests test, which does not include a presumption in favor of either parent, utilized in disputes regarding children born out of wedlock); *Petition of Two Minors For Change of Name*, 65 *Mass.App.Ct.* 850, 844 *N.E.*2d 710, 715–16 (2006) (applying a best-interests test, which did not include a presumption, to a divorced mother's application for a name change); *In re Saxton*, 309 *N.W.*2d 298, 301 (Minn.1981) (holding, in a dispute between divorced parents about the surname of their children, that "neither parent has a superior right" in applying a best-interests test); *In re Lavin*, 4 *Pa. D. & C.*4th 1, 2–4 (1989) (holding that "[n]either parent is to be accorded a presumption" in a contest when a divorced parent sought a change in children's surname). Indeed, the majority of states have refused to apply a presumption in the PPR's favor even when the child was born out of wedlock. *See Huffman v. Fisher*, 343 *Ark.* 737, 38 *S.W.*3d 327, 332 (2001); *Montgomery v. Wells*, 708 *N.W.*2d 704, 707–08 (Iowa App.2005); *Schroeder v. Broadfoot*, 142 *Md.App.* 569, 790 *A.*2d 773, 784 (2002); *Cohee v. Cohee*, 210 *Neb.* 855, 317 *N.W.*2d 381, 384 (1982); *Doherty v. Wizner*, 210 *Or.App.* 315, 150 *P.*3d 456, 461 (2006); *Hamby v. Jacobson*, 769 *P.*2d 273, 277 (Utah App.1989).

Third, the presumption necessarily tends to skew the determination toward a bias in favor of the maternal surname since, in the majority of cases, the PPR following a divorce is the child's mother. In its report regarding the child support received by "custodial parents" from "noncustodial parents," the United States Census Bureau observed that 82.2 percent of custodial parents were mothers, a result not statistically different from its 1994 report. *See* Timothy S. Grall, *U.S. Census Bureau, Custodial*

*Mothers and Fathers and Their Child Support: 2009* 2 (2011).[4]
The exaltation of the PPR's preference through application of the
presumption would, in the vast majority of cases, tend to create a
bias in favor of the maternal surname. The essential holdings in
*Gubernat* and *Ronan*, however, turned on the Court's rejection of
the traditional bias in favor of the paternal surname to a gender-
neutral test; as the Court declared, "in resolving disputes over
surnames we apply the best-interests-of-the-child standard *free of
gender-based notions of parental rights.*" *Gubernat, supra,* 140
*N.J.* at 141, 657 *A.*2d 856 (emphasis added). We, therefore, think
it unlikely that the Court intended to replace a gender-biased
standard that favored the paternal surname with a gender-biased
standard that favors the maternal surname in cases where the
parents named their children while married.[5]

Fourth, the presumption was established and continued in the
context of disputes in which the child was born as a result of a

---

[4] In footnote one of its report, the Census Bureau defined the custodial parent
as the "parent with whom the child(ren) lived during the survey interview when
their other parent(s) lived outside the household, although there may be equal
joint- or split-custody arrangements." Grall, *supra,* at 1 n. 2. Although the
report's definition of a custodial parent may be broader than what we have
referred to herein as a PPR, we think that distinction would not greatly alter our
conclusion that the large majority of PPRs are women.

[5] We also note that *N.J.A.C.* 8:2–1.4 codifies the initial naming of a child in a
birth certificate in instances where the parents are unwilling or unable to agree.
For example, the regulation provides that "the choice of the child(s) name rests
with the parent who has custody of the newborn child" when "either parent is
unavailable for any reason." *N.J.A.C.* 8:2–1.4(a)(1). And the regulation declares
that "[i]n cases where both parents have custody of the child, both are available,
and disagree on the selection of a surname, the surname selected by one parent
and the surname selected by the other parent shall both be entered on the
certification, separated by a hyphen, with the selected names entered in alpha-
betical order." *N.J.A.C.* 8:2–1.4(a)(2). The regulation also authorizes the State
Registrar to designate a name in situations where the parents or custodian of the
child fail to make a decision within five days of the child's birth. *N.J.A.C.* 8:2–
1.4(b). These regulations, however, apply to the initial naming of a child, not to
disputes arising when one parent seeks to change that name over the objection of
the other parent.

momentary physical relationship, as occurred in *Gubernat*, or a broader, but brief, committed relationship, as in *Ronan*. The presumption applies less logically or fairly in cases where the parents entered into a committed relationship of significant duration, where the children were originally named by a marital partnership—rather than one parent—undoubtedly with the intent that the designation remain permanent.

Fifth, at least to some degree, the application of the presumption in disputes between divorced parents may have an untoward tendency to transform the question into a bargaining chip in divorce negotiations. A parent concerned over the other's desire to change a child's surname may choose to litigate the amount of parenting time—a dispute that might have been averted by an otherwise appropriate parenting-time settlement.

Sixth, but of perhaps greater weight than the other reasons for our decision, the parties stipulated at the time they divorced that they would exercise joint legal custody. The significance of this agreement cannot be overstated in considering the issues presented by this appeal; in fact, it was greatly under-appreciated in the trial court. A stipulation to joint legal custody constitutes the parties' agreement to share "authority and responsibility for making 'major' decisions" regarding the welfare of the children, calling upon "both parents to remain decision-makers in the lives of their children." *Beck v. Beck*, 86 *N.J.* 480, 487, 432 *A.*2d 63 (1981). *See also Pascale v. Pascale*, 140 *N.J.* 583, 596, 660 *A.*2d 485 (1995); *Nufrio v. Nufrio*, 341 *N.J.Super.* 548, 550–52, 775 *A.*2d 637 (App.Div.2001). Certainly, the decision to seek a change in a child's surname constitutes a significant matter relating to the child's health, safety and welfare that is relegated first to the joint legal custodians and, upon dispute, to the court. That the parties deemed their relationship regarding legal custody to be a shared obligation—calling upon them to first attempt to "agree, communicate and cooperate ... notwithstanding animosity or acrimony they may harbor towards each other," *Nufrio, supra,* 341 *N.J.Super.* at 550, 775 *A.*2d 637—demonstrates that the parties recog-

nized that neither possessed a superior right in such an important matter.

■ Because the trial judge decided the matter by adopting a presumption in favor of Jessica's choice, we reverse and remand for further consideration of Jessica's request for a change in the children's surname based upon the application of the best-interests factors without resort to a presumption in her favor.

## II

Paul also argues that we should set aside the trial judge's determination because of the manner in which it came before the trial court. As noted in our brief description of the proceedings, Paul filed a motion in the matrimonial matter, seeking to enjoin Jessica from utilizing a different surname for the children; Jessica cross-moved for a change of the children's surname. Paul argues that Jessica's application should have taken the form of a separate complaint for a name change in accordance with the procedures contained in *N.J.S.A.* 2A:52–1 to –4. Paul's argument exalts form over substance.

To be sure, the Legislature authorized a process by which a name might be changed, declaring that "[a]ny person may institute an action in Superior Court, for authority to assume another name," and imposing requirements regarding the content of a complaint for a change of name. *N.J.S.A.* 2A:52–1.[6] We reject

---

[6] *N.J.S.A.* 2A:52–1 states in its entirety:

Any person may institute an action in Superior Court, for authority to assume another name. The complaint for a change of name shall be accompanied by a sworn affidavit stating the applicant's name, date of birth, social security number, whether or not the applicant has ever been convicted of a crime, and whether any criminal charges are pending against him and, if such convictions or pending charges exist, shall provide such details in connection therewith sufficient to readily identify the matter referred to. The sworn affidavit shall also recite that the action for a change of name is not being instituted for purposes of avoiding or obstructing criminal prosecution or for avoiding creditors or perpetrating a criminal or civil fraud. If

the contention that this statute literally mandated that Jessica seek a name change by filing a complaint in the children's names as described in *N.J.S.A.* 2A:52-1, to the exclusion of all other possible avenues for seeking such relief.[7]

Indeed, we note that the process adopted here was no different from that utilized in *Ronan, supra,* 182 *N.J.* at 105, 861 *A.*2d 822, where relief regarding the child's name was sought by motion in a pending custody and visitation action. *See also N.J. Div. of Youth & Family Servs. v. J.L.,* 264 *N.J.Super.* 304, 311, 624 *A.*2d 628 (Ch.Div.1993). The focus should not be on the type of vehicle that contains the request for relief but whether notice of the application and an opportunity to be heard was provided. *See, e.g., Mullane v. Central Hanover Bank & Trust Co.,* 339 *U.S.* 306, 313, 70 *S.Ct.* 652, 656–57, 94 *L.Ed.* 865, 873 (1950); *Doe v. Poritz,* 142 *N.J.* 1, 106, 662 *A.*2d 367 (1995). Regardless of whether a name change is sought by motion in an existing family action or by a new and separate action in the manner provided by *N.J.S.A.* 2A:52-1, the trial court remains obligated to ensure that the parties have a full and fair opportunity to present evidence and arguments regarding the application's merits. We do not view the rendering of these fundamental due process rights in a given case as problematic, as Paul argues, when a parent seeks a change of a child's name by motion in an existing family case. Our family courts are constantly confronted with post-judgment motions that develop into full-scale litigation, requiring discovery and ultimately an evidentiary hearing. Had Jessica filed a separate complaint, pursuant to *N.J.S.A.* 2A:52-1, it would have eventually been

criminal charges are pending, the applicant shall serve a copy of the complaint and affidavit upon any State or county prosecuting authority responsible for the prosecution of any pending charges. A person commits a crime of the fourth degree if he knowingly gives or causes to be given false information under this action.

[7] *Viola v. Fundrella,* 241 *N.J.Super.* 304, 309, 574 A.2d 1036 (Ch.Div.1990) is overruled insofar as it holds that the statutory process provides the sole avenue for a parent to seek a change of a child's name.

referred for disposition to the family judge familiar with this matrimonial action. *See R.* 4:3–1(a)(3); *R.* 5:1–2(a). Accordingly, Jessica's choice of procedure and forum did not substantively alter the manner in which the issue was adjudicated; whether filed by motion or by separate complaint, the judge was required to afford the parties a full and fair opportunity to be heard and was bound to conduct an evidentiary hearing to the extent necessary to develop the pertinent facts.

### III

To summarize, we reverse not because of the form of the proceedings but because the judge mistakenly applied a presumption in Jessica's favor and failed to develop the record and the facts necessary to permit a principled disposition of the dispute based on the best-interests test.

Reversed and remanded for proceedings consistent with this opinion. We do not retain jurisdiction.