39 A.3d 222 (2012)
424 N.J. Super. 590
Heather HOLST-KNUDSEN f/k/a Heather Mikisch, Plaintiff-Appellant,
v.
Erik MIKISCH, Defendant-Respondent.
Docket No. A-3596-10T1
Superior Court of New Jersey, Appellate Division.
Argued January 18, 2012.
Decided March 6, 2012.
*223 Mark H. Sobel argued the cause for appellant (Greenbaum, Rowe, Smith & Davis LLP, attorneys; Mr. Sobel, of counsel and on the brief; Dennis F. Feeney, Roseland, on the brief).
Erik Mikisch, respondent, argued the cause pro se.
Before Judges A.A. RODRÍGUEZ, ASHRAFI and FASCIALE.
The opinion of the court was delivered by
ASHRAFI, J.A.D.
Plaintiff Heather Holst-Knudsen appeals from a February 9, 2011 order denying in part her post-divorce motions and granting the cross-motion of defendant Erik Mikisch to reduce his child support payments. We affirm the order in part and reverse it in part. Because the trial court did not make sufficient findings of fact as to child support and the proposed change of the child's surname, and because it did not apply controlling law to those issues, we reverse and remand those parts of the order.

I.
Holst-Knudsen and Mikisch were married in 2000. Their daughter was born in 2005. They divorced in December 2008. The final judgment of divorce incorporated a marital settlement agreement, negotiated with the assistance of counsel, which established detailed parenting arrangements and financial support obligations for the child. Two years after the divorce, Holst-Knudsen moved to enforce the child support provided by the divorce judgment, to require that Mikisch make payments through the Probation Department by means of wage garnishment, to modify the parenting schedule, and to change the child's surname to a combination of both parents' names, "Mikisch Holst-Knudsen." Mikisch filed pro se opposition and also a cross-motion to reduce his child support obligation.
The marital settlement agreement provided that the parents would have joint legal custody of their daughter and that Holst-Knudsen would be the parent of primary residence for the child. The agreement laid out a complex parenting time schedule in contemplation of Mikisch living *224 outside New Jersey. He was granted parenting time on the third weekend of each month and an escalating schedule of summer parenting time: four non-consecutive weeks in the summer of 2010, five consecutive weeks in the summer of 2011, and six consecutive weeks in the summer of 2012 and future years. The agreement also required that the parties be flexible on the parenting schedule and "make every effort to insure that the Husband has unhampered contact with the Child."
Shortly before the divorce, Mikisch moved to South Carolina to take a position as vice president of sales and marketing for an internet media and marketing company. His salary was $140,000 at the time of the marital settlement agreement. Holst-Knudsen was also employed, apparently lucratively, but our record does not reveal the amount of her income. The parties waived any claim for alimony.
As to child support, the agreement acknowledged that its payment schedule deviated from New Jersey's Child Support Guidelines. See Child Support Guidelines, Pressler & Verniero Current N.J. Court Rules, Appendix IX-F to R. 5:6A at 2567-78 (2012). The agreement provided a schedule for escalating obligations of Mikisch for payments every other week directly to Holst-Knudsen. He was to pay $425 per week through August 2009, then $450 per week through August 2010, and $525 per week after that time. The agreement also provided for future payment by means of wage garnishment if Mikisch did not make timely direct payments to Holst-Knudsen.
According to Mikisch, in January 2009, just one month after the divorce, his South Carolina employer reduced his annual salary to $19,500. He claimed that the salaries of other employees were similarly reduced. In March 2009, he resigned from that company and began seeking other employment. In August 2009, Mikisch relocated to California in search of employment. At some point, he obtained an executive position with another internet start-up company, but with only an expectation of future income rather than a current salary. He claimed he submitted about 180 applications for employment over a two-year period, but he only managed to find income-producing work sporadically and was paid through contractual and commission agreements rather than a steady salary.
After ten months in California, Mikisch returned to New Jersey to focus his job search on the East Coast. To facilitate that effort and his time with their daughter, Holst-Knudsen allowed Mikisch to stay at the former marital home from May to September 2010. Mikisch claimed that he cared for their daughter at that time in lieu of paying child support. Holst-Knudsen responded that a nanny was employed to care for the child at all times. In September 2010, Mikisch returned to California and began living with a woman, whom he subsequently married.
Mikisch had stopped making child support payments in March 2009. According to Holst-Knudsen, he had paid nothing through the time of argument in the trial court on her enforcement motion, January 28, 2011. According to Mikisch, he made a few payments, including compensating the child's nanny and paying other expenses of the child, for which he sought credit against his child support arrears. Holst-Knudsen referenced the provisions of the marital settlement agreement that required him to share in expenses of the child, and she claimed he owed much more than he had paid. Mikisch did not expressly dispute that he was more than $41,000 in arrears on child support payments at the time of the cross-motions.
*225 After he moved out of New Jersey, Mikisch did not consistently exercise his parenting time as scheduled by the parties' agreement. He said he could not afford the cost of travel to New Jersey every month. Holst-Knudsen financed several trips for Mikisch to spend time with their daughter, and she allowed him to use her car while he was in New Jersey and also paid for hotel accommodations on some occasions. In addition, she paid for the child's trips out of state, accompanied by her nanny, to spend time with Mikisch. In her motion, Holst-Knudsen claimed that the parenting schedule should be reduced because the child was emotionally harmed by Mikisch's failure to spend parenting time with her as the parties had contemplated in their agreement. After Mikisch filed opposition and his cross-motion to reduce child support, Holst-Knudsen filed reply papers that included a certification from the nanny accusing Mikisch of indulging in excessive drinking of alcohol and other misdeeds while with the child.
[At the court's direction, portions of Section I of its opinion, which concern discrete issues, have been redacted from the published opinion because they do not meet the criteria set by R. 1:36-2(d) for publication. The published parts of the opinion continue as follows.]
The court denied Holst-Knudsen's motion to eliminate monthly weekend parenting time but granted her request to reduce summer parenting time to two weeks each in July and August, non-consecutive, instead of the five consecutive weeks in the summer of 2011 provided by the parties' agreement. The court also required that Mikisch furnish itineraries and full contact information to Holst-Knudsen when he exercises parenting time, and also give two weeks notice if he intends to exercise his monthly parenting time and thirty days notice before summer parenting time.
The court denied Holst-Knudsen's motion to change the child's surname, stating that she had not shown good cause for the change. The court also granted Holst-Knudsen attorney's fees for the enforcement motion, ordering Mikisch to pay $6,650 within thirty days.

II.
[At the court's direction, Sections II A through C of its opinion, which concern discrete issues, have been redacted from the published opinion because they do not meet the criteria set by R. 1:36-2(d) for publication.]

III.
Holst-Knudsen asserts the court erred in denying her motion to change the child's surname to Mikisch Holst-Knudsen. She argues that the trial court did not follow the controlling law of this State as established in Gubernat v. Deremer, 140 N.J. 120, 657 A.2d 856 (1995).
Our standard of review does not require any deference to the trial court's "interpretation of the law and the legal consequences that flow from established facts." Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378, 658 A.2d 1230 (1995). We conduct plenary review of questions of law. Crespo v. Crespo, 395 N.J.Super. 190, 194, 928 A.2d 833 (App.Div.2007).
In Gubernat, the Supreme Court held that when parents who are not raising a child together do not agree about the child's name, the court must resolve the dispute under the best-interest-of-the-child standard with a "strong presumption" that the name selected by the "custodial parent" is in the child's best interest. Gubernat, supra, 140 N.J. at 144, 657 A.2d 856. The non-custodial parent bears the burden *226 of proving by a preponderance of the evidence that the custodial parent's choice is not in the child's best interest. Id. at 145, 657 A.2d 856.
The Court in Gubernat defined the term "custodial parent" as the "the parent primarily charged with making custodial decisions in the child's best interest," id. at 123, 657 A.2d 856, or alternatively, as the parent "who exercises physical custody or sole legal custody," id. at 144, 657 A.2d 856. The strong presumption in favor of the custodial parent's choice is not irrefutable. Id. at 145, 657 A.2d 856. The Court envisioned rebuttal of the presumption by evidence such as use of the non-custodial parent's surname for a period of time, the child's "comfort with the continuation of that surname," and frequent contact of the child with the non-custodial parent. Id. at 144-45, 657 A.2d 856.
The trial court should "examine scrupulously all factors relevant to the best interests of the child," id. at 145, 657 A.2d 856, including the length of time the child used one surname, the identification of the child as a member of a family unit, the potential anxiety or embarrassment the child might experience if the child bears a surname different from the custodial parent, and any preference the child expresses if sufficiently mature, id. at 141, 657 A.2d 856. See also Staradumsky v. Romanowski, 300 N.J.Super. 618, 620-21, 693 A.2d 556 (App.Div.) (applying the Gubernat presumption to the custodial mother's choice of first and last names of child), certif. denied, 151 N.J. 467, 700 A.2d 879 (1997); J.S. v. D.M., 285 N.J.Super. 498, 499-500, 667 A.2d 394 (App.Div.1995) (applying the Gubernat presumption to affirm denial of father's motion to change child's surname to his).
In Ronan v. Adely, 182 N.J. 103, 108-09, 861 A.2d 822 (2004), the Supreme Court confirmed that a presumption applies in favor of the choice made by the primary caretaker parent.[1] The trial court had denied the mother's request to change her child's surname to both parents' names, "Adely Ronan," on the ground that the parties had not mutually agreed to the change and the child had been known by the father's surname for more than two years. Id. at 105, 861 A.2d 822. The Supreme Court reversed, reiterating that the court was required to presume the primary caretaker mother's choice was in the child's best interest and the father bore the burden of overcoming that presumption. Id. at 111, 861 A.2d 822.
Recently, another panel of this court addressed the name change issue and reached a conclusion that we do not adopt. In Emma v. Evans, 424 N.J.Super. 36, 37-38, 40-41, 35 A.3d 684 (App. Div.2012), the panel held that the presumption established by Gubernat does not apply to children born to married parents. The panel's careful analysis in Emma, id. at 40-46, 35 A.3d 684, has much to commend a possible variation from strict application of a Gubernat presumption in all cases. But we do not read the Supreme Court's holdings as making a distinction between children born out of wedlock and those born to married parents.[2]
*227 In Gubernat, supra, 140 N.J. at 126-41, 657 A.2d 856, the Court's historical exposition of surnames included reference to traditional common law treatment of children born out of wedlock. Id. at 131-32, 657 A.2d 856. But the Court did not make such a distinction in reaching its holding that a presumption applies where the parents do not agree. Instead, the Court acknowledged that its decision would affect "society's longstanding, customary expectation that children of married parents bear the paternal surname," id. at 145, 657 A.2d 856, thus strongly implying that the Court's holding applies to previously married parents. Moreover, in Ronan, supra, 182 N.J. at 108, 861 A.2d 822, the Court stated explicitly that the standard for changing a surname established in Gubernat applies "whether the child is born in or out of wedlock."
The panel in Emma gave as one of its reasons for dispensing with a presumption the fact that a child born "in wedlock" was originally named "by a marital partnership. . . undoubtedly with the intent that the designation remain permanent." 424 N.J.Super. at 45, 35 A.3d 684. Although it is reasonable to assume that married persons have jointly chosen the child's full name at the time of birth, and that they have no expectation then that circumstances will change, the same may be true for unmarried parents, and yet the Gubernat presumption is the law of this State as to them.
The distinction drawn in Emma may unfairly disadvantage a divorced parent who has undertaken primary caretaking responsibility for a child. The other parent may have abandoned the child born during the marriage, or the parental relationship may have deteriorated. In those circumstances, the Gubernat presumption would seem to apply fairly in favor of the parent who has raised and cared for the child born in wedlock. Placing an initial burden on a parent to prove that his or her choice is in the child's best interest may encumber that choice by reviving fixed beliefs about tradition and custom, the primacy of maintaining the child's identification with the other parent, or speculation about future problems for the child. See Gubernat, supra, 140 N.J. at 140-42, 657 A.2d 856.
We find more merit in another reason expressed in Emma for distinguishing some cases from the Gubernat analysis. If the parties entered into a detailed settlement agreement that addressed parenting issues, perhaps the parents should be on equal footing in determining a significant matter such as the child's name. Emma, supra, 424 N.J.Super. at 44-45, 35 A.3d 684. The Supreme Court might choose to consider a different ordering of proofs in cases that include negotiated parenting agreements. Detailed agreements pertaining to the custody and care of a child are not limited to divorce cases but may also be executed by unmarried parents. See N.J.S.A. 9:2-4d.
If the parties have expressed a position in their agreement regarding the child's name, the usual standards would apply for enforcement of that agreement, or modification because of changed circumstances or other good cause. If the agreement is silent with respect to the child's name, as it is in this case, then the Supreme Court might consider whether the parties should be on neutral ground rather than proceeding with a presumption in favor of the caretaking parent's choice. It may be that omission of an express position on the child's name at the time of a settlement agreement was purposeful; it may indicate the parents' joint acceptance of the child's existing name. It may also be that the omission means the parents could not reach agreement, or, in all likelihood, they *228 did not consider the issue at all. In any case, the Supreme Court may consider whether a presumption should apply where the parties have expressed their agreement on other issues pertaining to their child but have not specifically addressed the question of the child's name.
Parenthetically, we note that disputes about a child's surname may have overriding importance for some parents. The tragic aftermath of Gubernat[3] mandates that the family court attend carefully to any motion to change a child's name and make a decision in the best interest of the child with a record of the reasons for that decision. Ronan, supra, 182 N.J. at 111, 861 A.2d 822.
In this case, the court gave the following explanation for denying Holst-Knudsen's motion:
The parties divorced two years ago. There was something [sic] with regard to the name and, you know, it could have been done. There's joint legal custody. That was the decision of the parties at that time. Clearly, if Ms. Holst-Knudsen remarries or changes her name again, we're not going to change the child's name again. I don't see necessarily that there's any good cause shown for that particular change and . . . I'm going to deny that.
The court appears to have expressed some of the same concerns we and the panel in Emma have discussed. It vaguely made reference to the marital settlement agreement but did not clarify what conclusion it drew. Nor could it have done so without making more explicit findings of fact as to the best interest of the child.
The court's reasoning was a departure from the holdings of Gubernat and Ronan; it assumed that Holst-Knudsen must show good cause for the name change. As we have explained, the court must presume Holst-Knudsen's choice is in the child's best interest because she has been the primary caretaker for the child, and Mikisch must bear the burden of rebutting that presumption.
We reverse the court's denial of the motion to change the child's surname to a combination of both parents' names and remand to the Family Part to reconsider the motion in accordance with the standards and analysis established in Gubernat and Ronan.
Reversed and remanded. We do not retain jurisdiction.
NOTES
[1] In Ronan, supra, 182 N.J. at 104, 111, 861 A.2d 822, the Supreme Court used a revised designation for the parent with primary responsibility for the child, changing the phrase "custodial parent" to "primary caretaker parent."
[2] The Supreme Court also did not view joint legal custody of the child as a significant factor in applying a presumption in favor of the primary caretaker parent. The fathers in both Gubernat, supra, 140 N.J. at 125, 657 A.2d 856, and Ronan, supra, 182 N.J. at 105, 861 A.2d 822, had been awarded joint legal custody of the child.
[3] See Clifford Levy, Father Kills His Son, 3, Then Himself, N.Y. Times, May 16, 1995, http://www.nytimes.com/1995/05/16/nyregion/ father-kills-his-son-3-then-himself.html? pagewanted = all&src = pm.