SYLLABUS

(This syllabus is not part of the opinion of the Court. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Supreme Court. Please note that, in the interest of brevity, portions of any opinion may not have been summarized.)

### Paul Emma v. Jessica Evans (A-112-11) (070071)

**Argued March 12, 2013 -- Decided August 12, 2013**

**LaVECCHIA, J., writing for a unanimous Court.**

In this appeal, the Court addresses the standards to be applied in resolving a dispute between divorced parents regarding a change in their children's surname.

Jessica Evans and Paul Emma were married in 1999. During their marriage, they had two children, the first born on January 11, 2006, and the second born on November 6, 2007. At birth, the children were given their father's surname, Emma. In 2010, Jessica and Paul were divorced. The judgment of divorce incorporated a property settlement agreement in which they agreed to joint legal custody with Jessica as the primary residential/physical custodian.

Within months of the divorce, Paul discovered that Jessica had modified the children's surname from Emma to Evans-Emma on school and health-care records. He filed a motion seeking an order to prevent the use of the name Evans-Emma. Jessica filed a cross-motion seeking to change the children's surname from Emma to Evans. The trial court denied Paul's request and granted Jessica's cross-motion. Relying on this Court's decision in Gubernat v. Deremer, 140 N.J. 120 (1995), the trial court determined that the proper test in a name-change dispute was the best interests of the child and, in conducting that analysis, the surname chosen by the custodial parent is presumed to be in the best interests of the child. In so ruling, the trial court disagreed with Paul's argument that such a presumption only applied to children born out of wedlock.

On appeal, the Appellate Division reversed the trial court's ruling and held that a presumption in favor of the name chosen by the custodial parent was improper when the child was born in wedlock to parents who subsequently divorce. Emma v. Evans, 424 N.J. Super. 36 (2012). The panel concluded that the question was one of first impression and was not governed by this Court's opinion in Gubernat. Canvassing other jurisdictions, the panel noted a strong disinclination to apply a presumption in favor of the primary custodial parent in cases where the parents were married at the time of the child's birth. The panel gave great weight to the fact that Jessica and Paul agreed to joint legal custody, noting that such custody requires parents to share the responsibility of making major child-rearing decisions. In the panel's view, the decision to change a child's name was a significant matter that required, at a minimum, an attempt to agree. The panel reversed the trial court's order and remanded for consideration of Jessica's name-change request based on the best-interests-of-the-child standard without a presumption in her favor.

The Court granted Jessica's petition for certification. 210 N.J. 217 (2012).

**HELD:** In a dispute to rename a child of divorced parents, the party seeking to alter the surname jointly given to the child at birth bears the burden of proving by a preponderance of the evidence that the change is in the child's best interest. Irrespective of whether the parents were married at the time of the child's birth, the best-interests-of-the-child test should be applied in a renaming dispute without a presumption in favor of the custodial parent's decision to change the jointly given surname of the child.

1. In Gubernat, the Court concluded that full legal equality for women was incompatible with continued recognition of a presumption that children must bear their father's surname. The Court held that the appropriate standard governing naming disputes is the best-interests-of-the-child standard. The Court recognized that difficulty could arise in applying that standard and adopted a presumption in favor of the surname chosen by the custodial parent to enhance the predictability of the best-interests-of-the-child test. New Jersey courts have applied Gubernat's standards in situations that deviated from Gubernat's facts with varying results. The Appellate Division has issued

opinions that conflict with respect to whether a rebuttable presumption in favor of the primary custodial parent is required in renaming disputes between divorced persons who were married when they named their children. The Court resolves that question in this appeal. (pp. 10-19)

2. The Court gleans from Gubernat a thematic insistence on avoiding paternalistic preferences and ensuring a gender-neutral approach to child-naming decisions. For these purposes, a strong presumption in favor of the custodial parent's naming decision was of obvious universal assistance. However, a strong presumption is not so obviously of assistance in ensuring that resolution of child renaming disputes are child-centric in their application of a best-interests-of-the-child test. Resolution of a dispute over the changing of a child's surname after parents jointly named their child should remain firmly fixed on the child's best interests. (pp. 19-24)

3. The continued use of the Gubernat presumption can result in an automatic endorsement of the primary custodial parent's choice. The presumption operates on a premise of superior knowledge by that parent about the child's best interests. A change in the child's jointly given surname, however, is not akin to daily parenting decisions as to which a primary custodial parent's knowledge of a child is unique. The decision to change a child's name is a major decision. The joint custodians must make an attempt to agree on any change to their child's surname. Absent an agreement, the parties may bring their dispute to the courts, where they should start with equal rights – without either party benefiting from a presumption in his or her favor. (pp. 24-27)

4. With modern life giving rise to so many varied relationship settings into which a child may be born, Gubernat's interest in gender neutrality is not promoted by broad continuation of a presumption in favor of a parent of a primary residence, or custodial parent, when applying the best-interests-of-the-child standard in name-change disputes that arise after a child has been given a surname jointly by his or her parents. In disputes over whether a child's agreed-upon surname should be changed, it is not just to provide a presumption to a custodial parent's choice of name. The presumption in such renaming disputes is rejected irrespective of whether or not the parents were married at the time of the child's birth. (pp. 27-31)

5. Applying the best-interests-of-the-child test in the context of a dispute over whether to change a child's name requires a fact-sensitive analysis. Each case should be weighed on its merits. Some factors to consider are: the length of time the child has used his or her given surname; identification of the child with a particular family unit; potential anxiety, embarrassment or discomfort that may result from having a different surname from that of the custodial parent; and the child's preference if the child is mature enough to express it. (pp. 31-34)

The judgment of the Appellate Division is **AFFIRMED AS MODIFIED**, and the matter is **REMANDED** to the Chancery Division for further proceedings.

**CHIEF JUSTICE RABNER; JUSTICES ALBIN, HOENS and PATTERSON; and JUDGES RODRÍGUEZ and CUFF (both temporarily assigned) join in JUSTICE LaVECCHIA's opinion.**

PAUL EMMA,

    Plaintiff-Respondent,

        v.

JESSICA EVANS,

    Defendant-Appellant.


        Argued March 12, 2013 – Decided August 12, 2013

        On certification to the Superior Court,
        Appellate Division, whose opinion is
        reported at 424 N.J. Super. 36 (2012).

        Lynda M. Yamamoto argued the cause for
        appellant (Jan R. Evans, attorney).

        Richard F. Klineburger, III argued the cause
        for respondent (Klineburger and Nussey,
        attorneys; D. Ryan Nussey, on the brief).


    JUSTICE LaVECCHIA delivered the opinion of the Court.

    This appeal arises from a post-divorce dispute over the surname given to two children by their married parents. After the parents' divorce was finalized in all respects, including the execution of a property settlement agreement giving both parents joint legal custody and making no mention of any change to the children's surnames, the mother -- the parent of primary residence of the children -- unilaterally began using a hyphenated version of the parents' two surnames with hers listed

first.  When challenged, the mother filed a formal application to modify the children's names to her surname alone.

In the application of the best-interests-of-the-child test in this renaming dispute, the question is whether the custodial parent -- here, the parent of primary residence -- should be entitled to the presumption that her renaming decision is in the children's best interests.  We hold that the best-interests-of-the-child test, informed by factors identified herein, should be applied in this renaming dispute without the heavy tilt of a presumption in favor of the custodial parent's decision to change the jointly given surname of these children.  In applying the best-interests test in this matter, the party seeking to alter the status quo from the surname jointly given to the children at birth must bear the burden of proving by a preponderance of the evidence that the change in the children's surname is in their best interests.

I.

Jessica Evans and Paul Emma were married on August 20, 1999.  During their union, Jessica and Paul had two children, the first born on January 11, 2006, and the second born on November 6, 2007.  At birth, the children were given their father's surname, Emma.

In 2008, Jessica and Paul separated, and on January 21, 2010, their divorce was finalized in a judgment of divorce.  The

judgment incorporated a property settlement agreement (PSA) in which Jessica and Paul agreed to exercise joint legal custody of their two children.  The PSA designated Jessica as "the primary residential/physical custodian" and Paul as "the alternate residential parent."  The PSA, which detailed an agreed-upon parenting schedule, allowed the children to reside with Paul on alternating weekends and to visit with him overnight every Thursday night to Friday morning and four hours every Tuesday morning.  The PSA was silent with respect to any change to the children's surname.  Jessica resumed the use of her birth name, Evans, after the divorce, pursuant to N.J.S.A. 2A:34-21.

Within months of the divorce's conclusion, Paul discovered that Jessica had modified their children's surname from Emma to Evans-Emma on health-care and school records.  On September 29, 2010, Paul filed a motion seeking an alteration to the parenting schedule alleging that, relevant to this appeal, Jessica unilaterally attempted to change their children's surname.  In his prayer for relief, he requested an order preventing the use of the name Evans-Emma.  In response to Paul's motion, Jessica filed a cross-motion seeking to change their children's surname from Emma to Evans.

On December 3, 2010, the trial court entered orders denying Paul's request to have the children use the name Emma instead of Evans-Emma and granting Jessica's cross-motion to change the

3

children's legal surname from Emma to Evans.  Relying on this Court's decision in Gubernat v. Deremer, 140 N.J. 120 (1995), the trial court determined that the proper test in a name-change dispute was the best interests of the child and, in conducting that analysis, the surname chosen by the custodial parent is presumed to be in the best interests of the child.

The trial court disagreed with Paul's argument that such a presumption only applied to children born out of wedlock.  It also rejected Paul's arguments that the children's surname should not be changed because the children would be embarrassed by a mid-school-year name change, that both parties have family in the area who spend time with the children, and that the name change had confused their elder child.  Reasoning that the children had not used "the paternal surname for very long" and that the children were young enough to avoid "future anxiety, embarrassment, and discomfort" as a result of a name change, the court concluded that Paul had not "overcome the strong presumption in favor of the surname chosen by the custodial parent."

On appeal, the Appellate Division reversed the trial court's ruling and held that a presumption in favor of the name chosen by the custodial parent was improper "when the child was born in wedlock to parents who subsequently divorce."  Emma v. Evans, 424 N.J. Super. 36, 37 (2012).  In a thoughtful opinion

4

authored by Judge Fisher, the panel provided six reasons in support of that conclusion.

First, the panel rejected the notion that a presumption in favor of a custodial parent applies to children named at birth by married parents. Id. at 41. The panel reasoned that this Court's repeated statement that the best-interests-of-the-child standard applies, regardless of whether a child is born to married or unmarried parents, did not also "encompass[] an intent to apply a presumption in favor of the" primary custodial parent's choice of surname in naming disputes. Ibid. (citing Gubernat, supra, 140 N.J. at 139; Ronan v. Adely, 182 N.J. 103, 108 (2004)). The panel concluded that the question was one of first impression and that the result in this case was not governed by either Gubernat or Ronan. Ibid.

Second, canvassing other jurisdictions, the panel noted a strong disinclination to apply a presumption in favor of the primary custodial parent in cases where the parents were married at the time of the child's birth. Id. at 42-43 (citing cases). Further, the panel observed that a majority of jurisdictions rejected such a presumption "even when the child was born [to parents] out of wedlock." Id. at 43 (citing cases).

Next, the panel expressed concern that, contrary to the Court's intent when it established a presumption in Gubernat, applying a presumption in favor of the primary custodial

5

parent's name in resolving renaming disputes such as this one would skew away from gender neutrality. Id. at 43-44 (noting United States Census Bureau data showing that 82.2 percent of "custodial parents" are mothers). The panel also found that presumption to be less logical or fair when applied to children born into a marital relationship, with the likely intent that the surname jointly chosen was to be permanent, than it was in the non-intact relationship into which the child in Gubernat was born. Id. at 44-45.

In addition, the panel posited that a presumption in favor of the primary custodial parent's choice of names would create a "bargaining chip in divorce negotiations," explaining that parents who are concerned about the possibility of a future surname dispute may be more inclined to litigate over custody and parenting time. Ibid.

Finally, the panel gave greatest weight to the fact that Jessica and Paul agreed to joint legal custody, finding that the significance of joint legal custody could not be overstated because it requires parents to share the responsibility of making major child-rearing decisions. Ibid. In the panel's view, the decision to change a child's name was a "significant matter" that required, at minimum, an attempt to agree. Ibid. Thus, "neither [parent] possessed a superior right in such an important matter." Id. at 46.

Consequently, the panel reversed the trial court's order and remanded for consideration of Jessica's name-change request based on the best-interests-of-the-child standard without a presumption in her favor. Ibid. Jessica filed a petition for certification with this Court, which was granted. 210 N.J. 217 (2012).

II.

A.

Jessica's petition asserts that the Appellate Division erred in holding that the presumption in favor of a primary custodial parent's choice of names does not apply to naming disputes involving children born during a marriage. She argues that Gubernat directly applies to the facts of this case. Further, she contends that the panel's holding results in discrimination based on marital status. She contends that the panel's reliance on a single census data point leads to an overly broad conclusion that a presumption in favor of the primary custodial parent would result in a bias in favor of maternal surnames. And, she asserts that reliance on cases from other jurisdictions is misguided because most of those cases predate Gubernat and some include what she characterizes as paternalistic language inconsistent with this Court's gender-neutral preference.

Jessica also maintains that the panel's concern regarding custody and parenting time becoming a "bargaining chip" if it carries the possibility of a presumption in favor of a subsequent name change is misplaced because disputes over such matters already are commonplace. She similarly contends that the panel's reliance on the joint legal custody between the parents in this matter also is misplaced, maintaining that the status has no bearing on the best-interests-of-the-child standard for naming disputes.

In place of the panel's reasoning, Jessica advocates following the logic of the differing appellate decision in Holst-Knudsen v. Mikisch, 424 N.J. Super. 590, 601 (App. Div. 2012). Holst-Knudsen was published shortly after the Appellate Division's opinion in Emma and held that Gubernat and Ronan require courts to extend a rebuttable presumption in favor of the primary custodial parent regardless of whether a child was born to married or unmarried parents. Jessica contends that the Emma panel's conclusion results in divorced parents not having access to a rule of law that provides a strong presumption to know what is in their children's best interests. Thus, she argues, the logic of the Appellate Division's opinion leads to the absurd distinction that only children born out of wedlock have primary custodial parents who can be trusted to make decisions in the children's best interests.

8

B.

Paul urges the Court to affirm the decision of the Appellate Division and remand the matter for a hearing without applying a presumption in favor of Jessica's choice of surname. In large part, he maintains that the Appellate Division's opinion was soundly reasoned and relies on it to support his position. With respect to the decision in Holst-Knudsen, Paul notes that the appellate panel in that matter expressly left open the possibility that this Court may wish to conclude that divorcing parents who enter into an agreement addressing custody and parenting time should be on equal footing in later naming disputes when those agreements do not address the children's name. Id. at 599-600.

Paul also disputes Jessica's argument that the Appellate Division's opinion leads to an absurd distinction. He asserts that the great number of other jurisdictions that have declined to apply a presumption in favor of the custodial parent supports the soundness of not applying such a presumption in post-divorce renaming disputes. Moreover, he contends that nothing in the panel's decision implies that children born during a marriage will be treated less favorably than children born to unmarried parents when the best-interests test is applied without a presumption in favor of a parent of primary residence, and that

the appellate court's decision promotes the gender-neutral approach favored by this Court.

### III.

### A.

Our review of New Jersey jurisprudence governing name-change disputes must begin with Gubernat, supra, 140 N.J. 120. In that case, a unanimous Court rejected six hundred years of paternalistic naming preferences in Western culture, concluding that "full legal equality for women" was "incompatible with continued recognition of a presumption that children must bear their father's surname." Id. at 122-23. Writing for the Court, Justice Stein concluded "that in contested cases the surname selected by the custodial parent -- the parent primarily charged with making custodial decisions in the child's best interest -- shall be presumed to be consistent with that child's best interests, a presumption rebuttable by evidence that a different surname would better serve those interests." Id. at 123. From that statement emerges the core of the dispute before us today. To better understand that holding, however, it is important to place the dispute in that case in context.

The child at the center of the dispute in Gubernat was born to unmarried parents who were not in an intact relationship. Ibid. The child's biological father initially denied paternity and was not listed on the child's birth certificate. Ibid. At

the time of the child's birth, the mother gave the child her surname, id. at 122, and only after the father's paternity legally was established and acknowledged did the father seek an order changing the child's surname as a part of a visitation and custody dispute, id. at 123-24.  The trial court granted the name change, concluding "that the child's interests would not be served by retaining the maternal surname, which could represent to the child a rejection by his father."  Id. at 126.  This Court plainly rejected that conclusion.

In an opinion that comprehensively reviewed the history of naming practices, id. at 126-38, our Court made clear the preference in this state to end those paternalistic preferences, id. at 139 ("The Legislature clearly has ended gender-based differences in marital and parental rights, whether rooted in law or custom, and instead determined that parental disputes about children should be resolved in accordance with each child's best interests.").  We noted that the New Jersey Parentage Act (the Act), N.J.S.A. 9:17-35 to -59, was "'intended to establish the principle that regardless of marital status, all children and parents have equal rights with respect to each other.'"  Id. at 137-38 (quoting S. 888 (Assembly Judiciary, Law, Public Safety and Defense Comm. Statement to Senate No. 888), 200th Leg., 2d Sess. at 1 (N.J. Oct. 7, 1982) [hereinafter Committee's Statement to Senate No. 888]).  The Act also aimed

11

to "eliminate[] legal differences between children born in a marriage and children born out of wedlock," id. at 138 (noting that line of United States Supreme Court cases "'mandate[ed] equal[] treatment between legitimate and illegitimate children'" (quoting Committee's Statement to Senate No. 888, supra, at 1)), and to ensure that "claims of the natural father and the natural mother are entitled to equal weight, i.e., one is not preferred over the other solely because he or she is the father or the mother," ibid. (quoting In re Baby M, 109 N.J. 396, 453 (1988)). Furthermore, the Legislature amended custody laws so that when a marriage ends, "the public policy of this State is to assure that minor children are in frequent contact with, and cared for, by the non-custodial, as well as the custodial, parent." Ibid. (citing L. 1990, c. 26, § 2 (codified at N.J.S.A. 9:2-4)).

In Gubernat, we concluded that the appropriate standard governing naming disputes, "regardless of the child's birth status," is the best-interests-of-the-child standard. Id. at 139. Moreover, we added that the best-interests-of-the-child standard in naming disputes should not give greater weight to a father's preference, thus ensuring a "standard free of gender-based notions of parental rights." Id. at 141. That is, the child's best interests should not be "synonymous with the father's best interest," and "[t]he preservation of the paternal bond is not and should not be dependent on the retention of the

12

paternal surname; nor is the paternal surname an indispensable element of the relationship between father and child." Id. at 140-41 (rejecting "preference that some courts accord to paternal surnames in the context of determining the best interests of the child"). Further, we delineated certain factors to be considered in a best-interests-of-the-child analysis in a naming dispute:

> [T]he length of time that the child has used one surname, the identification of the child as a member or part of a family unit, the potential anxiety, embarrassment, or discomfort the child might experience if the child bears a surname different from the custodial parent, and any preferences the child might express, assuming the child possesses sufficient maturity to express a relevant preference.
>
> [Id. at 141 (citations omitted).]

Because we recognized that difficulty could arise in applying those factors, we adopted "a presumption in favor of the surname chosen by the custodial parent" to enhance the predictability of the best-interests-of-the-child test. Id. at 142. The reasoning for embracing that presumption was that custodial parents presumably act in the child's best interest and that the parent "having physical custody of the child is generally accorded broad responsibility in making daily child-rearing decisions." Ibid.

13

In support of that approach, the Court noted that a presumption in favor of the name chosen by the custodial parent was not novel. Id. at 142-43 (discussing several court decisions and commentators who favor application of custodial parent presumption). Further, the Court noted that "[s]ome states have adopted statutes or regulations that delegate the choice of the surname to the custodial parent." Id. at 143. For example, Kentucky law "provides that if the mother was not married at the time of conception or birth of the child, and there is no agreement between the father and mother concerning the surname to be assumed by the child, 'the child's surname shall be determined by the parent with legal custody of the child.'" Id. at 143-44 (quoting Ky. Rev. Stat. Ann. § 213.046(8)(a) (Michie 1994) (current version at § 231.046(10)(a) (2000)). Pennsylvania takes a similar approach: "'[i]f the parents are divorced or separated at the time of the child's birth, the choice of surname rests with the parent who has custody of the newborn child," id. at 144 (quoting 28 Pa. Code § 1.7(b) (1975)), and New Hampshire "mirror[ed] the Pennsylvania provision," ibid. (citing N.H. Rev. Stat. Ann. § 126:6-a(I)(a) (1993) (repealed and modified 2003)).

The Court also explained that a New Jersey law addressing name designation on birth certificates to be accepted for filing with registrars, see N.J.S.A. 26:8-26, contains a similar

14

provision. "[I]f either parent is unavailable, the choice of name is to be made by the custodial parent." Ibid. (citing N.J.A.C. 8:2-1.3(a)(1)). On the other hand, "[i]f both parents have custody but disagree on the name, the child shall be given a hyphenated surname based on alphabetical order." Ibid. (citing N.J.A.C. 8:2-1.3(a)(2)). Thus, we concluded that adoption of "a strong presumption in favor of the surname chosen by the custodial parent" was appropriate because of the "firmly grounded . . . judicial and legislative recognition that the custodial parent will act in the best interest of the child." Ibid.

That said, Gubernat cautioned that the presumption in favor of the custodial parent should not be irrefutable, id. at 145, and provided examples illustrative of situations that could rebut the presumption favoring a custodial parent's surname choice, id. at 144-45. Gubernat placed the burden, by a preponderance of the evidence, on the non-custodial parent challenging the custodial parent's surname choice to show that the "chosen surname is not in the best interests of the child," despite the presumption in favor of the custodial parent's choice of surname. Id. at 145. Further, the Court stressed that judicial review of such decisions should take care to avoid giving any weight to unsupported evidence or "impermissible gender preferences." Ibid.

15

From that starting point to modern child-naming law, our state's courts have applied Gubernat's standards in situations that deviated from Gubernat's facts with varying results.

In J.S. v. D.M., 285 N.J. Super. 498, 499 (App. Div. 1995), a child was born to parents involved in a short-term relationship, and at birth, the child was given the mother's surname. "A final domestic violence restraining order was issued against the father," and as part of that litigation, the father moved for custody of the child and to have the child's surname changed to the father's surname. Ibid. The trial court ordered the child's middle name to be changed to the father's surname. Ibid. The father appealed, arguing that the trial court erred in denying his motion to change the child's surname. Ibid. The Appellate Division affirmed the denial of the father's application, concluding that the father failed to rebut the strong presumption in favor of the child retaining the mother's surname. Id. at 500.

In Staradumsky v. Romanowski, 300 N.J. Super. 618 (App. Div.), certif. denied, 151 N.J. 467 (1997), the court similarly applied the Gubernat standard but reached a different result. There, the child was born to unmarried parents and given the paternal surname, and the child's entire name was particularly connected to the father's familial background. Id. at 619.

16

When the relationship ended, the parents were granted joint legal custody, with the mother as the primary custodial parent. Ibid. The mother then filed a motion to change the child's entire name -- not just his surname -- which was granted by the trial court. Id. at 620. On appeal, the panel found that the father had failed to rebut the strong presumption in favor of the primary caretaker, but it concluded that the total name change failed to consider the connection that the child shared with both families. Id. at 621. Thus, the panel ordered the child's middle name to be changed to the child's originally chosen first name, which also was a version of the father's first name. Ibid. The panel viewed this as a "fair solution" to prevent complete erasure of the child's connection with his father's family. Ibid.

More recently, in Ronan, supra, this Court addressed a name change dispute between parents who were not married at the time of the child's birth but who gave the child the father's surname, Adley. 182 N.J. at 104-05. After the parents' relationship ended, they were awarded joint legal custody, and the mother was named the primary caretaker. Id. at 105. Approximately one year after the separation, as part of a parenting time dispute, the mother requested a name change to include the child's use of both parents' names. Ibid. The trial court denied the motion, and the Appellate Division

17

affirmed; however, this Court reversed and remanded.  Id. at 104.

In that dispute, where the mother sought to have the child use a hyphenated version of both parents' names (continuing the child's original surname first and adding on the mother's surname to become Adley-Ronan), our Court expressed its belief that the hyphenated approach "would be consistent with the public policy expressed in the regulations issued by the New Jersey State Department of Health for resolving disagreements concerning the selection of a surname at birth."  Id. at 111 (citing N.J.A.C. 8:2-1.3(a)(2)).  Ultimately, however, the matter was remanded for reexamination of the best-interests-of-the-child analysis, noting that the courts that had considered the matter had failed to apply a rebuttable "presumption in favor of the primary caretaker that the name selected is in the best interests of the child," id. at 111-12, which, we stated, "applies whether the child is born in or out of wedlock," id. at 108.  At that time, we did not engage in an extended reexamination of the propriety of the presumption's use in the wide range of settings for disputes that involve renaming of children from the surname originally jointly given to children by their parents at birth, including one such as is presented in this renaming dispute, post-divorce, where the children's

18

surname is sought to be changed (from Emma to, first, Evans-Emma and then to Evans).

Following Ronan, the Appellate Division issued two opinions that conflict with respect to whether a rebuttable presumption in favor of the primary custodial parent is required in renaming disputes between divorced persons who were married when they named their children. Compare Emma, supra, 424 N.J. Super. at 48 (concluding that no presumption applied in favor of custodial parent in dispute between parents married when children were born), with Holst-Knudsen, supra, 424 N.J. Super. at 601 (concluding that presumption applied in favor of custodial parent in dispute between parents who were married when children were born).

Our task in this appeal is to resolve that precise question and, in the process, bring greater clarity to the usefulness of a presumption in disputes involving the changing of a child's surname from that which the child was given at birth.

IV.

A name change is a significant event for a child, even for very young children. A name originally given to a child carries great personal significance:

> The importance of names in society is of ancient origin. . . . Elsdon C. Smith in The Story of Our Names (1930) observed that except to the most intimate friends a person's name is the most prominent feature.

19

> It is also the most vulnerable point. An old Roman maxim runs, 'Sine nomine homo non est' (without a name a person is nothing). One's name is a signboard to the world. It is one of the most permanent of possessions; it remains when everything else is lost; it is owned by those who possess nothing else. A name is the only efficient means to describe someone to contemporaries and to posterity. When one dies it is the only part that lives on in the world.
>
> [In re Willhite, 706 N.E.2d 778, 780 (Ohio 1999) (internal quotation and citation omitted).]

Scholarly study has explored the interest that a child has in his or her name. Lisa Kelly, Divining the Deep and Inscrutable: Toward a Gender-Neutral, Child-Centered Approach to Child Name Change Proceedings, 99 W. Va. L. Rev. 1, 59-60 (1996). For example, citing work done by a structural-linguistic psychoanalyst on how names are a "unique form of linguistics linked to human identity formation," id. at 59, Kelly notes that a child is "placed through his or her name within the social web of family and community. A child's identity[,] which attaches through his or her name, then, attributes to him or her important social information -- kinship, ethnicity, religion and race," id. at 60.

Names not only have religious and ethnic meaning and implications that impart knowledge and understanding of one's self but also have roots in basic human rights. See id. at 62-63 (noting "Judeo-Christian view that names are a basic part of

human identity" and that United Nations Declaration of Rights of the Child of 1959 "declared that the right of a child to a name is fundamental"). Research has shown that "in the real lives of young children names and identity formation are knit together." Id. at 63. Thus, under any approach to naming, the importance to a child of his or her name cannot be understated. At bottom, "learning one's name is an important part of the identity formation process, whether that identity is in flux or permanent, public or private." Ibid.

Accepting the importance of a name given to a child, even a very young child in the process of forming his or her identity through the elemental process of learning his or her name, the decision to alter a child's name is, as noted, a significant moment in a young life. The decision to alter a child's name has been viewed in various ways by different participants in a name-changing process. For example, some fathers have viewed the right to have a child bear his name as a quid pro quo in exchange for support of the child, id. at 52-53, thus turning the surname that a child bears into a bargaining chip between warring parents. Fathers also have argued for a "protectable interest" in having a child bear the paternal surname to preserve the paternal lineage. See, e.g., Pizziconi v. Yarbrough, 868 P.2d 1005, 1007-09 (Ariz. Ct. App. 1993). In other instances, courts have raised the specter of a surname

21

change attenuating the relationship between the child and a former spouse. See, e.g., Leadingham v. Smith, 56 S.W.3d 420, 425 (Ky. Ct. App. 2001).

However, as the Court held in Gubernat, supra, a name change must be viewed from the perspective of the child's interests in having his or her name changed, hence our selection of a best-interests-of-the-child test. 140 N.J. at 139. Further, we applied the best-interests-of-the-child standard "free of gender-based notions of parental rights" and thus eliminated any preference that a court might accord to paternal surnames in the context of determining the child's best interests. Id. at 141. At its core, the Gubernat Court was convinced that courts should perform a gender-neutral evaluation of a child's best interests when called on to assess the relative benefits and detriments in choosing between a maternal or paternal surname, and it sought to identify criteria for use in that determination. Ibid. The Court's criteria hew to the criteria that have wide acceptance in the best-interests analysis.

The vast majority of factors used by courts when evaluating the best interests of the child in a naming dispute have been drawn from the Uniform Parentage Act (1973). See Kelly, supra, at 57. Ultimately, the factors can be broken down into general categories:

1) the child's wishes;
2) the child's identity;
3) the effect of the name on the child's relationship with others, including community and various family units;
4) the effect on the child's property interests;
5) the effect of the name change on the parents;
6) parental misconduct; and
7) motivations underlying the name change.

[Id. at 59.]

As is demonstrated by those categories, some factors are child-centric, such as giving consideration to the child's wishes or sense of identity. Other factors, such as the effect of the name change on the parents, are less child-centered. Not all factors will be relevant in every case, and some factors overlap with others. Id. at 58-59. In our view, what is most important about the use of these generally recognized factors in these fact-sensitive cases is that the overall impact of the test be child-centered.

V.

It is with that emphasis in mind that we consider the use of a presumption in connection with a naming dispute relating to a child already named by both parents. Specifically, we examine whether the best-interests test is well-served by continuing a presumption in favor of a primary custodial parent, see Gubernat, supra, 140 N.J. at 123, 141, in renaming disputes that

23

involve a change in a child's surname from that which was originally jointly selected by the parents at birth.

In our revisiting of Gubernat in this decision, we cannot add to the opinion's learned recitation of the history of Western culture's naming practices. However, we glean from Gubernat a thematic insistence on avoiding paternalistic preferences and ensuring a gender-neutral approach to child-naming decisions when such disputes require judicial resolution. For those purposes, a strong presumption in favor of the custodial parent's naming decision was of obvious universal assistance.

However, a strong presumption is not so obviously of assistance in ensuring that resolution of child renaming disputes are child-centric in their application of a best-interests-of-the-child test. While gender neutrality is, no doubt, an important public policy in resolving naming disputes between mothers and fathers in dispute over the name to be given at birth, a dispute over the renaming of a child's surname occurring after parents jointly named their child should remain firmly fixed on the child's best interests.

### A.

To the extent that special knowledge about the child affected by the name change is important in the best-interests analysis, the view of the custodial parent certainly is relevant

24

and a factor that must be considered. The custodial parent's choice of surname, be it to retain the surname already given in defense to another's attempt to alter a surname post-divorce, or affirmatively to change it, is an important fact to be considered in the best-interests test.

So too are the views of others who can demonstrate relevant knowledge about the impact of a proposed surname change on a child, such as the non-primary custodial parent who also has developed a relationship with the child, or a teacher or other adult with a close relationship with the child. The custodial parent, while enjoying an intimate living relationship with the child, does not have the sole relevant information on the subject. Moreover, in a post-divorce setting, and absent an agreement between two parents sharing joint legal custody, it is far from clear that the custodial parent should be entitled to a presumption in connection with a rigorous application of a best-interests analysis to a request to change a child's surname.

With respect to the presumption in favor of the custodial parent that was adopted in Gubernat, while it made compelling sense in the setting in which it arose, its continued use arguably can shrink the best-interests analysis to an automatic endorsement of the primary custodial parent's choice in a renaming dispute. A primary custodial parent's choice is an

insufficient reason in and of itself to support a change in a child's surname.

When it comes to changing a surname jointly given to a child at birth, the use of the Gubernat presumption favoring a custodial parent operates on a premise of superior knowledge about the child's best interests.  A change in a child's jointly given surname, however, is not akin to daily parenting decisions as to which a primary custodial parent's knowledge of a child is unique.  A surname change for a child in such circumstances deserves a searching inquiry into the child's best interests. It is not a step to be taken based on whim or preference.  A child's name ought not to be changed except on good and sufficient reason -- the importance of a child's name, as discussed above -- requires as much.  Thus, a custodial parent, or any other party seeking to change a child's jointly given birth surname, must satisfy the best-interests test.

Over the years since it was announced, the Gubernat presumption has been extended beyond its original setting where it served the clear purpose of ensuring that paternalistic preferences in originally choosing a child's surname were abandoned and were prevented from being insinuated into the application of the best-interests-of-the-child standard if a unilaterally selected surname was later challenged.  Expanded use of the presumption has raised issues prominently now in

26

post-divorce and other settings where the name change dispute arises after the surname originally was selected jointly by the parents of a child. We fail to see the appropriateness of any form of presumption in such settings. Further, the inappropriateness of a presumption in the application of the best-interests test is even sharper in the context of parents who share joint legal custody of their children.

As the appellate panel in this case rightly pointed out, joint legal custody requires parents "to share 'authority and responsibility for making "major" decisions' regarding the welfare of the children, calling upon 'both parents to remain decision-makers in the lives of their children.'" Emma, supra, 424 N.J. Super. at 45 (quoting Beck v. Beck, 86 N.J. 480, 487 (1981)). The decision to change a child's name surely constitutes a major decision. Consequently, the decision of whether to change a child's name falls to the joint custodians to make an attempt to agree on whether to change a child's name. Then, absent the ability to forge an agreement, the dispute may be brought to the courts. However, because joint legal custodians start with a responsibility to make decisions together, so too should they start in the court system with equal rights -- without either party benefiting from a presumption in favor of his or her choice of names.

B.

27

As originally noted in Gubernat, supra, the Legislature strongly prefers gender-neutral approaches to settling parenting disputes. 140 N.J. at 138-39. Further, our public policy favors elimination of legal differences between children born to married and unmarried couples; the claims of both natural parents should be accorded equal weight. See id. at 137-38 (citing Committee's Statement to Senate Bill No. 888, supra, at 1); Baby M, supra, 109 N.J. at 453. Those two policies, clearly demarked in 1995 at the time Gubernat was decided, retain equal if not more importance today.

During the course of the past fifty years, our country has "witnessed significant changes in the form and function of the traditional family unit." Doherty v. Wizner, 150 P.3d 456, 463-64 (Or. Ct. App. 2006) (discussing statistical shifts in marriage, divorce, and birth rates to unmarried couples). Between 1970 and 2010, according to United States Census Bureau Data, "the annual number of marriages per 1,000 unmarried adult women" had decreased by more than fifty percent. National Marriage Project at the University of Virginia, The State of Our Unions: Marriage in America 2012, at 62 (Dec. 2012), available at http://nationalmarriageproject.org/wp-content/uploads/2012/12/SOOU2012.pdf. Although the precise cause of that decline is open to interpretation, the conclusion from that data remains -- fewer Americans are getting married.

28

Id. at 63-64. In addition, today's divorce rate is nearly twice that of 1960. Id. at 67. While the divorce rate has declined slightly from its apex in the early-1980s, the percentage of divorced adults has quadrupled since 1960. Id. at 68-69 (noting, according to various data sources, that adults who marry for first time have lifetime probability of separation or divorce between forty and fifty percent).

Adding to this new landscape of family structure is the rise in the birth rate for unmarried women. See Joyce A. Martin et al., U.S. Dep't. of Health and Human Servs., 68 Nat'l Vital Stat. Rep. 1, at 8 (Aug. 28, 2012), available at http://www.cdc.gov/nchs/data/nvsr/nvsr61/nvsr61_01.pdf. In fact, between 1980 and 2010, the number of births to unmarried couples has steadily increased. Ibid. Not only have the numbers of children living in single households or in shared living arrangements changed, so too have the types of relationships that are state-sanctioned. New Jersey recognizes civil unions between same-sex couples, N.J.S.A. 37:1-28, in whose households children are being raised. The conclusion to be drawn from this data is clear: the face of the modern American family is vastly different than that of as recent a time as the mid-Twentieth Century.

With modern life giving rise to so many varied relationship settings into which a child may be born, we fail to see how

29

_Gubernat_'s interest in gender neutrality is promoted by broad continuation of a presumption in favor of a parent of primary residence, or "custodial parent," when applying the best-interest-of-the-child standard in name-change disputes that arise after a child has been given a surname jointly by his or her parents. Consequently, in disputes over whether a child's agreed-upon surname should be changed, we do not consider it just to provide a presumption to a custodial parent's choice of name.

Our rejection of a presumption in such name change circumstances applies irrespective of whether or not the parents originally were married at the time of the child's birth. In that respect, the Appellate Division points to persuasive authority from a majority of other jurisdictions. _Emma_, _supra_, 424 _N.J. Super._ at 42-43. An approach that grants neither parent a preference when they agreed on a name at birth advances the goal of gender neutrality and eliminates distinctions between children born during marriage and children born outside of wedlock. It nevertheless takes into account special knowledge that a custodial parent may have as to the benefits and detriments to the current surname and the proposed surname in the life of the child in that parent's custody.

In sum, while a presumption in favor of the choice of the surname given by the custodial parent at birth was appropriate

30

under the facts presented by Gubernat, we hold that in renaming disputes between parents who agreed on a surname at birth but find themselves later in a dispute over whether to alter the surname, the proper standard to apply is the best interests of the child.[1]  The parents in such a dispute should be on equal footing; neither parent should have a superior right. Therefore, we further hold that neither parent should benefit from a presumption in favor of his or her choice of names.

## C.

When parents have agreed on a name at birth, the parent seeking the name change in a subsequent dispute must bear the

---

[1] The 1995 landmark decision in Gubernat shattered gender stereotypes in naming disputes in this state by declaring that a best-interests-of-the-child standard would apply and supersede historic cultural expectations that a biological father could insist that his out-of-wedlock child should presumptively bear his surname once paternity of the child was established.  The facts of Gubernat cannot be separated from the strong pronouncements that the opinion announced.  The Court was focused most keenly on how to settle a dispute when a parent seeks to change the name given by the only custodial parent at birth.  140 N.J. at 122-23.  In that context, the presumption in favor of the custodial parent established in Gubernat makes compelling sense and that presumption should continue to be applied to factual circumstances similar to those that arose in Gubernat.  That said, the rationale of Gubernat should not be extended to apply to disputes that, like this, arise after a surname was given to a child by his or her parents acting in concert.  To the exent that Holst-Knudsen holds otherwise, we do not follow it.  To the extent Ronan is read expansively to suggest otherwise, we caution against such a reading.  In Ronan, as indicated previously, our focus was more fixed on the relief requested and did not involve a full reexamination of the utility of a presumption in renaming disputes such as we squarely address in this matter.

burden of showing by a preponderance of the evidence that the name change is in the child's best interest. The best-interests-of-the-child test applies regardless of the label attached to the parent's relationship at the time of the child's birth. Whether the parents are married, in a civil union, unmarried, or in a short-term or long-term relationship, the relevant starting point is whether the parents agreed on a surname at birth.

Applying the best-interests-of-the-child test in the context of a dispute over whether to change a child's name requires a fact-sensitive analysis. Courts should be careful to not give weight to any interests that are unsupported by evidence in the record. Just as importantly, courts should avoid giving weight to any evidence stemming from gender preferences.

Each case should be weighed on its own merits. Although we do not attempt to enumerate all of the possible factors that may bear on a best-interests-of-the-child analysis in these disputes, the following factors originally enumerated in Gubernat are valid, child-centric considerations:

> 1.  The length of time the child has used his or her given surname.
>
> 2.  Identification of the child with a particular family unit.

3.   Potential anxiety, embarrassment, or discomfort that may result from having a different surname from that of the custodial parent.

4.   The child's preference if the child is mature enough to express a preference.

Moreover, courts may also consider such additional factors as the following, some of which had been identified by the Gubernat Court as factors to be used in rebutting the custodial parent presumption, but which now should be considered as part of the gender-neutral and child-centered totality-of-the-circumstances analysis of the child's interest in retaining or having altered his or her given surname:

5.   Parental misconduct or neglect, such as failure to provide support or maintain contact with the child.

6.   Degree of community respect, or lack thereof, associated with either paternal or maternal name.

7.   Improper motivation on the part of the parent seeking the name change.

8.   Whether the mother has changed or intends to change her name upon remarriage.

9.   Whether the child has a strong relationship with any siblings with different names.

10.  Whether the surname has important ties to family heritage or ethnic identity.

11.  The effect of a name change on the relationship between the child and each parent.

33

In conclusion, the Appellate Division correctly reversed and remanded this matter for reevaluation without applying a presumption in favor of the custodial parent's naming choice. We affirm with modification the Appellate Division's reversal and remand. A new proceeding is required to evaluate Jessica's name-change application in accordance with the aforesaid principles applicable to the best-interests-of-the-child test.

VI.

As modified by this opinion, the judgment of the Appellate Division is affirmed.

CHIEF JUSTICE RABNER; JUSTICES ALBIN, HOENS and PATTERSON; and JUDGES RODRÍGUEZ and CUFF (both temporarily assigned) join in JUSTICE LaVECCHIA's opinion.

SUPREME COURT OF NEW JERSEY

NO.   __A-112__                          SEPTEMBER TERM 2011

ON CERTIFICATION TO _____Appellate Division, Superior Court_____

PAUL EMMA,

        Plaintiff-Respondent,

                v.

JESSICA EVANS,

        Defendant-Appellant.


DECIDED _____August 12, 2013_____
        _____Chief Justice Rabner_____ PRESIDING
OPINION BY _____Justice LaVecchia_____
CONCURRING/DISSENTING OPINIONS BY _____
DISSENTING OPINION BY _____

| CHECKLIST | AFFIRMED AS MODIFIED/ REMANDED | |
|---|---|---|
| CHIEF JUSTICE RABNER | X | |
| JUSTICE LaVECCHIA | X | |
| JUSTICE ALBIN | X | |
| JUSTICE HOENS | X | |
| JUSTICE PATTERSON | X | |
| JUDGE RODRÍGUEZ (t/a) | X | |
| JUDGE CUFF (t/a) | X | |
| TOTALS | 7 | |