**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0602-18T3

R.B.,

      Plaintiff-Respondent,

v.

A.B.,

      Defendant-Appellant.

_____

Submitted May 2, 2019 – Decided May 20, 2019

Before Judges Whipple and Firko.

On appeal from Superior Court of New Jersey, Chancery Division, Family Part, Bergen County, Docket No. FM-02-0246-18.

DiLorenzo & Rush, attorneys for appellant (Kenneth R. Rush, of counsel and on the brief).

Guaglardi & Meliti, LLP, attorneys for respondent (Barry S. Guaglardi, of counsel; Frances Oliveri, of counsel and on the brief).

PER CURIAM

Defendant A.B.[1] appeals from the Family Part's August 29, 2018 order compelling her to change the parties' son's name to Gi.F.B. on his birth certificate and social security card based upon a July 20, 2017 consent order. The parties agreed to name the child Gi.F.B. and use plaintiff's surname prior to his birth. Because our review of the record indicates a substantial change of circumstances occurred after the consent order was entered, we reverse and remand for a plenary hearing and appointment of a guardian ad litem for the child to determine what is in his best interest as to the first, middle, and last names he should be given.

I.

The parties were married on February 4, 2017, and separated on July 4, 2017, following a domestic violence incident. Defendant was four months pregnant at the time. Plaintiff alleged defendant "was acting verbally violent" during an argument and that "she attempted to run over [his] person" with her vehicle the day prior. Plaintiff reported to police that he knocked on the driver's side window of her vehicle in an attempt to talk to her and the "glass cracked

---

[1] Pursuant to Rule 1:38-3(d), we use initials and fictitious names to protect the confidentiality of the participants in these proceedings.

A-0602-18T3

slightly," but he claimed the glass was already broken. Plaintiff told police defendant drove over the grassy area of their front yard and into the road.

In a certification, plaintiff contends he saw defendant the next day, July 4, 2017, at a Rite Aid parking lot. He noticed that H.W., defendant's four-year-old child from a previous relationship, was unattended inside the vehicle, with the windows rolled up, when the outside temperature was ninety degrees. Plaintiff entered the store, retrieved the car keys from defendant, and started her car remotely to activate the air conditioning because he was concerned about H.W.'s well-being. Later that day, defendant went to the parties' residence "demanding" her medication[2] and a divorce. She returned to her vehicle, and according to plaintiff, "[a]gain tried to run over [him] in the driveway" and "drove over the grass speeding away." She returned five minutes later, "aggressively" entered the house, and began "ripping pictures off the walls, smashing glass, throwing objects and destroying property."

This incident occurred in front of plaintiff's three minor children from a prior relationship while H.W. was seated in defendant's car. After she refused to leave, plaintiff asked his nine-year-old son to dial 911. Plaintiff claims

---

[2]  The record does not provide the name of the medication or what it was prescribed for.

defendant walked up the stairs and threw herself down, yelling "why did you push me down the stairs[?]" One of plaintiff's sons allegedly stated "[d]ad did not push you, you fell, dad is at the bottom of the stairs." Defendant got up, punched plaintiff in the groin area, and proceeded to the family room, where she began throwing more pictures, resulting in the issuance of a temporary restraining order (TRO) to plaintiff. On July 19, 2017, he filed a complaint for divorce.[3]

Defendant's pleadings and certification set forth a different version of events. Following an argument on July 3, 2017, defendant verified she informed plaintiff that she could not return to the former marital home because she was afraid of him and she "vacated the property because plaintiff was physically and verbally abusive" towards her. Defendant certified plaintiff is a martial arts expert, "impose[d] his physical strength on [her] as a means of control[,]" and choked and struck her in the past. On July 4, 2017, defendant returned to the residence to retrieve items at a time she believed plaintiff would not be home, but plaintiff was there, blocked her vehicle with his own, and punched her car window with such force "that it caused a crack in the windshield." Defendant also stated plaintiff pushed her down the stairs, and after she left the home,

---

[3] This TRO was not provided in either parties' appendices.

A-0602-18T3

plaintiff repeatedly texted her and followed her, with his children in his car, despite her requests to be left alone.

Defendant also certified that plaintiff sent her text messages degrading her and persuading her to have an abortion, stating: "Two kids from two different guys, divorced [] a very loose pussy and herpes. That's what you offer to somebody"; "You're correct[,] I'm done. I actually don't like you[,] you're right. Because you're impossible to love"; "All the clothes and shit for you and your son will be thrown in the trash. That's where you belong"; "Deactivating the phone throw it out if you wish"; "I'm removing you from my bank accounts. And I'm finished with you now"; "You are nothing but a loose pussy white trash peasant. You will be miserable with whomever you're with the rest of your life if you can ever find someone again. No one wants you and you're not worth it." He further stated:

> You['re] psycho and nuts and I'm going to take that baby from you. And I'm calling [your ex-boyfriend] now[,] I'm telling him how you act so he can protect his son. You fucked with the wrong person. Go [beg] your parents to take you back in they probably won't either. You will not be able to get in my house you'll hear from my lawyer forward me an address where I can send divorce papers.
>
> By the way I spoke to him this morning and you're entitled to nothing.

A-0602-18T3

On July 20, 2017, plaintiff dismissed his TRO and the parties entered a consent order providing as follows:

> 1) Defendant is barred and restrained from the homes where [p]laintiff's children reside, including [p]laintiff's home . . . ("marital residence"), and the home of the [plaintiff's] children['s] mother[.]
>
> 2) Defendant is barred and restrained from any visitation, communication or involvement of any kind with [p]laintiff's children.
>
> 3) Defendant shall have no legal rights of any kind to the marital residence.
>
> 4) The parties shall not engage in any harassing or disparaging communication with each other whether by verbal, written or electronic means.
>
> 5) Defendant shall not self-inflict any harm to herself and/or the unborn child between the parties.
>
> 6) Defendant shall maintain her health and that of the unborn child, including but not limited to taking all medications prescribed for her pregnancy or otherwise.
>
> 7) The parties shall undergo psychiatric evaluations and shall continue therapy so long as recommended by such psychiatrists or ordered by the [c]ourt.
>
> 8) Plaintiff shall have open and liberal right to attend all pregnancy related medical visits of [d]efendant and to ask questions and receive information from [d]efendant's physicians at such visits with [d]efendant present. Defendant shall provide notice to [p]laintiff when such visits are scheduled. Defendant shall notify

6

[p]laintiff of any complications of emergency situations with the pregnancy.

9) Plaintiff shall be permitted to be present in the delivery room during the birth of the parties' child.

10) <u>The parties agree that the unborn child's name when born will be [Gi.F.B.], unless the parties mutually agree to change same later</u>.

11) Plaintiff shall pay for any unreimbursed medical expenses related to the pregnancy upon presentation of receipts or invoices by [d]efendant without prejudice.

12) Plaintiff shall maintain [d]efendant's cellphone as active on his plan without prejudice.

13) Defendant shall immediately change her mailing address from the marital residence with the post office. Plaintiff shall forward [d]efendant's mail to her at the address she designates.

The foregoing terms shall fully resolve the pending [TRO] entered against [d]efendant.

[(Emphasis added).]

Plaintiff was represented by Michael P. Meliti, Esq., and defendant appeared pro se. Before approving the consent order, the judge handling the domestic violence matter questioned defendant as follows:

[The court]: Okay. Do you understand that Mr. Meliti does not represent your interest, he only represented [plaintiff's] interest, correct?

[Defendant]: Yes, Your Honor.

[The court]: Okay. You didn't rely upon him for legal advice today, did you?

[Defendant]: No.

[The court]: Okay. Do you want to speak to an attorney before I enter this consent order under your FM Docket?

[Defendant]: No, Your Honor.

[The court]: FM meaning the divorce complaint?

[Defendant]: Right. No. I'm - -

[The court]: You - - You're comfortable in representing yourself?

[Defendant]: - - I'm one hundred percent comfortable. Thank you.

The judge found:

As to the consent order, I'm satisfied that you both have voluntarily entered into a consent order which you . . . both agree to be bound by. The plaintiff was represented by counsel, is satisfied with the services of his attorney. Defendant recognized the role of plaintiff's attorney, is comfortable in representing herself and was given the opportunity to speak to counsel and has declined and is ready to be bound by the terms of the agreement.

Prior to the child's birth in December 2017, the parties ostensibly entered into a parenting plan, which is undated and unsigned. The parenting plan refers

8

to the child as provided by the consent order, Gi.F.B., and outlined specific instructions to follow when defendant went into labor, including hydrating her without intravenous fluid as long as possible; lightly eating before labor; when to administer an epidural; which medication to use upon nausea; which medication to use upon contractions stopping or failing to start; the ability to take a walk before labor; and who would be permitted in the delivery room. At delivery, plaintiff would "help catch the baby" and "cut the cord[.]" In the event defendant underwent a cesarean section, the plan provided that the baby would be given to plaintiff as soon as he was "dried off[.]"

Plaintiff certified defendant claimed she was in pre-term labor on at least ten occasions. Defendant was residing with her parents after the parties separated, plaintiff alleged that she did not get along with them, they had "many altercations" and "she would often make excuses to go to the hospital so she would have a place to stay." On September 17, 2017, plaintiff admitted herself to Valley Hospital because she believed childbirth was imminent. Plaintiff went to the hospital and claims defendant "became extremely irate with [him], [and] argued with [him] over minuscule issues[.]" Defendant "informed the hospital that [plaintiff] was not permitted to be there with her or be in the delivery room for the baby if she did not choose." Plaintiff was escorted out of the hospital,

and his attorney obtained updates on defendant's condition from Valley's general counsel.

Defendant refutes plaintiff's allegations, certified her pregnancy was high risk, "required constant monitoring and by its very nature carried the potential of a serious medical condition." Defendant asserts plaintiff became belligerent, he was escorted out of the building because he was considered a danger, and he was unable "to calm down and attempt[ed] to start arguments with hospital staff."

On October 10, 2017, defendant sent plaintiff a text message stating she was in labor. She met plaintiff at his home, and they drove to Holy Name Hospital together. After learning she was not in labor, defendant asked plaintiff to pick her up at the hospital and he acquiesced. Defendant cursed at plaintiff when he arrived, and he reported that she called him "a piece of shit" for leaving her at the hospital, and wanted to sleep at his home, but plaintiff denied her request. Defendant "became irate and began screaming at [him]. She told [him] that [he] was never going to see [their] son and she would make sure that [he] was not at the hospital for his birth[.]" She punched him in the jaw while he was driving, and she demanded to be let out of the car. Defendant immediately experienced contractions again and returned to the hospital by ambulance. She

A-0602-18T3

claims plaintiff fought with her about driving to the hospital together, and he left her at the hospital "out of spite with no means to get home[,]" and not to retrieve belongings as he alleged. Defendant also certified plaintiff became angry because she wanted to be driven to Morris County, where she was living. Defendant filed a TRO[4] against plaintiff on October 11, 2017, alleging he

> began to verbally berate [her] while driving in his vehicle on Route 17 . . . . [and] called [her] a "worthless skanky whore[,"] pulled over the to the shoulder of Route 17 . . . and made [her] exit the vehicle on the roadway shoulder. [He] then sped off in his vehicle, not to return. [She] called [911] and Ridgewood police and ambulance responded to her location and transported [her] to Valley Hospital . . . . [She] was advised to file a [TRO] but did not do so because she was "afraid [he] would retaliate."

Plaintiff filed a cross-TRO against defendant on October 12, 2017. On October 18, 2017, defendant was admitted to Valley due to a lack of fetal movement and a decreased fetal heart rate. She informed plaintiff's counsel of her condition, but plaintiff decided not to go to the hospital due to the pending TROs.

Defendant filed her answer and counterclaim for divorce on December 22, 2017, alleging plaintiff was emotionally, mentally, and physically abusive

---

[4] Plaintiff is the defendant in the October 11, 2017 TRO because she filed first.

11

towards her. Defendant asserted plaintiff forcibly pulled her down the stairs of the martial home, causing her to fall down, and he sent her messages wishing she would die during her pregnancy. He cancelled defendant's automobile insurance, and removed funds from the marital bank account, leaving a "near zero" balance for her to utilize when she had no other funds available.

Plaintiff discovered defendant was disparaging him on social media. On October 30, 2017, defendant filed an order to show cause (OTSC) seeking to bar plaintiff from the delivery room because she was a high-risk pregnancy and four centimeters dilated at the time. She expressed concern plaintiff "may act out again in the hospital and create a stressful [and] unsafe labor." Plaintiff's counsel sent defendant an email on October 20, 2017, stating plaintiff "does not want to be present during the birth [and] does not want to be on the birth certificate as the father." She also requested emergent monetary relief but the judge denied her OTSC.

Defendant certified prior to the child's birth, "plaintiff did not contest paternity[,]" and shortly before given birth, "plaintiff made clear that he did not have an interest in parenting [their] child. He represented to [her,] through his counsel[,] that he did not wish to be listed on the birth certificate or referenced as the father of the child." "He further made clear that he would not attend the

delivery and did not want the child to know his identity or that of his other children[,]" and defendant could name the baby as she wished.  Plaintiff was not present for the child's birth and he did not sign the birth certificate.  Contrary to the consent order terms, defendant named the baby Gr.C.W., which is the name appearing on his birth certificate and social security card, and gave him her former surname.[5]

The first case management conference (CMC) in the dissolution matter was held on February 8, 2018, and both parties were represented by counsel.  Defendant began using her former name, A.W., at this point even though an order for name change had not been entered by the judge pendente lite.  Disputed issues listed on the CMC order included child support, alimony, equitable distribution, life insurance, and paternity.  The child's name was not designated as an issue in contention by either party.

The parties entered into a second consent order and civil restraining order on February 8, 2018, which prohibited them from having any direct or indirect contact with each other, and dismissed their pending TROs.  Handwriting on the order states: "In the event that this [c]onsent [o]rder shall overlap or conflict

---

[5]  We reviewed copies of the birth certificate and social security card and incorporate same into the record.

A-0602-18T3

with any prior orders, this [c]onsent [o]rder shall supersede any prior orders." There is no mention of the child's name in this consent order.

A March 6, 2018 CMC order was entered and the same issues were disputed, except that "paternity" was crossed out in the order and "name of child" was handwritten in its place. Custody and counsel fees were also added as disputed issues. On March 8, 2018, the parties and their son were ordered to submit to a paternity test, and the results confirmed plaintiff was the child's biological father. In her April 27, 2018 case information statement, defendant listed the child's name as "Gr.C.W." At the May 1, 2018 CMC, the same issues were in dispute, and at the June 19, 2018 CMC, the judge ordered custody experts to be designated by July 6, 2018. Plaintiff retained Dr. Judith Greif to serve as his custody and parenting time expert on July 6, 2018.[6] The record does not reflect if defendant retained a custody and parenting time expert.

The judge held oral argument on plaintiff's OTSC seeking to compel enforcement of the July 2017 consent order relative to the child's name. In an oral opinion, the judge stated:

> So the next request is that I enforce the July 20[], 2017, consent order that explains[,] that in addition to refusing to allow the child or him to be present in the delivery room, [defendant] unilaterally named the child

---

[6] Any reports generated by Dr. Greif have not been provided on appeal.

[Gr.C.W.], as opposed to [Gi.F.B.], as agreed upon in the July 20th consent order. . . .

We look favorably upon agreements between the parties because they're consensual and voluntary in nature [and] allow parents to reach accommodations, resolve differences, and assure the stability in the relationship that is here. The main objective of the [c]ourts in enforcing a contractual agreement, such as a consent order, which is not only a contractual agreement, is an order of the [c]ourt.

It is to carry out the mutual intent of the parties. Unless there are any legal or equitable basis for us to interfere with agreements that are made -- which I have not read any -- it is expected that the [c]ourt orders are going to be followed.

The court order shows and mandates that this child is to be named [Gi.F.B.]. I intend to sign an order that that is to take place, unless somebody can convince me otherwise.

. . . .

This is a mutual agreement that these parties entered into and they decided if this child, when this child was born, the child was going to be called [Gi.F.B.].

. . . .

I am not making any findings with regard to whether or not this is an intentional violation, which would impose sanctions under our rules, various sections of our rules. I have a consent order. I have an order signed by the [c]ourt. It has not been vacated. It has not been appealed from. It is well beyond the time for filing an

15

appeal. It is enforceable. It is going to be complied
with. Thank you.

The judge issued an order on August 29, 2018, stating: "[Gr.C.W.], minor child, who was born on December [], 2017, be and is hereby authorized to assume the name, [Gi.F.B., (the name set forth in the July 20, 2017 consent order)], from and after August 24, 2018." An amended order was issued by the judge on August 31, 2018, granting plaintiff supervised parenting time on "alternate Saturdays and Sundays from 12:00 [p.m.] to 5:00 [p.m.], commencing on August 25[], 2018, as well as "every Tuesday and Thursday, from 4:00 [p.m.] to 7:00 [p.m.]." All drop-offs were to be conducted by plaintiff's mother at either the Elmwood Park police department or at the child's day care center. The judge ordered supervised parenting time be continued until plaintiff's psychiatric evaluation was completed.

The child's medical records identify him as Gr.W., defendant's choice of his first and last names, and there is no mention of a middle name. The only medical document that refers to the child as Gi.F.B. is an immunization record from the child's pediatrician dated February 28, 2019.[7] This document states,

---

[7] These records were provided upon our request. The child's pediatric records include approximately twenty office visits and identify the child as Gr.W. Plaintiff was listed as the informant twice and the rest of the visits were attended by defendant.

"[Gi.'s] last physical examination was January 9, 2019[,]" and this document was to be attached to his school forms. An immunization record, dated January 11, 2019, has the child's name listed as Gr.W., and was also to be attached to his school forms.

The child also had several hospital admissions and these records refer to him as Gr.W. A discharge summary states:

> Of note there is an open [Division of Child Protection and Permanency (Division)] case. Mom and biological dad are not together and do not have a great relationship. Mom has full custody, however within the last month biological dad able to see [child] couple of hours a week. Mom reports threats from biological dad to harm child and has concern for possible unknown ingestion.

The July 2017 incidents resulted in the Division filing an OTSC because it had concerns about the parties' ability to co-parent. A fact-finding hearing was held on November 4, 2017.

On January 23, 2018, the Division judge entered an order directing supervised parenting time between the child and defendant on a "liberal basis" by Division approved supervisors, which included defendant's parents and sister. With consent of plaintiff, defendant was granted sole legal and physical custody of the child, referred to as Gr.W. in the order, which also provided:

> With consent, [plaintiff] is restrained from co-parenting the minor [Gr.C.W.] with [defendant]. [Plaintiff] acknowledges that the Division has identified services deemed necessary for [the parties] to safely parent [Gr.W.]. [Plaintiff] is declining services at this time <u>as he does not wish to parent the child</u>. Should [plaintiff] decide to exercise visitation with [Gr.W.], he shall make an application under the FM [D]ocket on notice to the Division.
>
> [(Emphasis added).]

The Division amended the status of the case against plaintiff to "established" as to two of his older sons, and plaintiff was ordered to have supervised parenting time with all three of his children from his prior relationship. Plaintiff certified he only agreed to relinquish custody of Gr.W. and "resolved the action with [the Division] solely so that [his] [c]hildren would no longer be subject to the constant home visits and interviewing by the [l]aw [g]uardian and others involved with the Division[,]" and the only reason he consented to defendant having sole custody of their son was to cease involvement with the Division. He certified defendant "had made clear that she did not want [him] to be involved in the [c]hild's life by excluding [him] from medical visits and hospital appointments and failing to give the [c]hild [his] last name[.]"

Defendant argues plaintiff relinquished custody because "he had no desire to be involved in the child's life[,]" which "was a major factor" in the Division's decision to dismiss plaintiff from the case without completing services. Notably, plaintiff did not participate in any recommended services, and he waived his right to custody and parenting time of the parties' child. No appeal was taken from this order. Throughout the Division's involvement, plaintiff did not contest paternity, and it only became an issue in the matrimonial case after defendant sought child support.

On appeal, defendant argues that the judge erred in enforcing the July 20, 2017 consent order relative to the child's name without performing a best interest of the child analysis; failed to consider the substantial change of circumstances after its entry when she became the sole custodial parent the month after his birth based upon the Division judge's January 23, 2018 order; that plaintiff waived his right to contest the child's name by not filing his application sooner; and she is entitled to relief under Rule 4:50-1.

II.

A trial court's fact-finding should be generally undisturbed "when supported by adequate, substantial, credible evidence." Cesare v. Cesare, 154 N.J. 394, 412 (1998). The appellate court gives particular deference to a trial

A-0602-18T3

judge's fact finding in a family matter because the trial court's expertise and its "opportunity to make first-hand credibility judgments about the witnesses who appear on the stand; it has a 'feel of the case' that can never be realized by review of the cold record." N.J. Div. of Youth & Family Servs. v. E.P., 196 N.J. 88, 104 (2008) (quoting N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 293 (2007)).

A trial judge's fact-finding should only be reversed if his or her findings are "so wholly unsupportable as to result in a denial of justice." In re Guardianship of J.N.H., 172 N.J. 440, 472 (2002) (quoting In re Guardianship of J.T., 269 N.J. Super. 172, 188 (App. Div. 1993)). This court should not reverse the family court's decision "when there is substantial credible evidence in the record to support the court's findings." E.P., 196 N.J. at 104.

In Gubernat v. Deremer, our Supreme Court held "that in contested cases the surname selected by the custodial parent—the parent primarily charged with making custodial decisions in the child's best interest—shall be presumed to be consistent with that child's best interests, a presumption rebuttable by evidence that a different surname would better serve those interests." 140 N.J. 120, 123 (1995). Unlike this case, the parties in Gubernat were not married, but the father was not present at the birth, and he was not named on the child's birth certificate.

Ibid. "'[T]he best interests of the child' is the applicable standard governing most decisions affecting the welfare of children[,]" and is applied "in determining the appropriate surname to be given to a child, regardless of the child's birth status." Id. at 139. A child's surname should only be altered "when the change promotes the child's best interests." Ibid. (quoting In re Saxton, 309 N.W.2d 298, 301 (Minn. 1981)).

Our Court rejected the preference that other state courts afforded to paternal surnames in the context of determining the best interests of the child, finding that "[t]he preservation of the paternal bond is not and should not be dependent on the retention of the paternal surname; nor is the paternal surname an indispensable element of the relationship between father and child," id. at 141, and adopted a strong presumption in favor of the custodial parent's choice of surname that is rebuttable. Id. at 144-45. The burden is on the non-custodial parent to prove, by a preponderance of the evidence, that the custodial parent's choice of surname is not in the best interests of the child. Id. at 145.

"Courts should examine scrupulously all factors relevant to the best interests of the child and should avoid giving weight to any interests unsupported by evidence or rooted in impermissible gender preferences." Ibid. This rebuttable presumption upholds the custodial parent's right "to make

21

decisions in the best interests of the child[,]" while permitting judicial intervention upon "a sufficient showing" that the custodial parent's choice of name is not in the child's best interests. Ibid. In applying the best interests of a child in determining a surname, courts should consider a number of criteria, including:

> the length of time that the child has used one surname[;] the identification of the child as a member or part of a family unit[;] the potential anxiety, embarrassment, or discomfort the child might experience if the child bears a surname different from the custodial parent[;] and any preferences the child might express, assuming the child possesses sufficient maturity to express a relevant preference.
>
> [Id. at 141.]

In Staradumsky v. Romanowksi, 300 N.J. Super. 618, 621 (App. Div. 1997), we exercised original jurisdiction, pursuant to Rule 2:10-5,[8] to change the child's name. The plaintiff mother applied to change the first, middle, and last names of the parties' three-year-old son. Id. at 619. The parents were unmarried, but while in a relationship, agreed to have the child baptized as Stefan Francis Joseph Romanowski. Ibid. Plaintiff claimed after the child was born, defendant threatened to take their son away from her if she did not agree

---

[8] Rule 2:10-5 states: "The appellate court may exercise such original jurisdiction as is necessary to complete determination of any matter on review."

to the name they agreed upon. Id. at 619-20. Plaintiff conceded to defendant's demand because she feared he would cease supporting her. Id. at 620. Defendant denied threatening her, claimed that they discussed the child's name, and reached a compromise. Ibid.

The parties shared joint legal custody, with physical custody granted to plaintiff. Id. at 619. Plaintiff did not like the name Stefan, and she requested to legally change his name to Christian Francis Staradumsky. Id. at 620. Her application was granted by the trial court. Id. at 619. Despite the court order, each party and their families called the child by the name they preferred. Id. at 620. We addressed the holding in Gubernat and noted "[i]t did not, however, speak of the given names, nor did it consider the change in names after the parties had expressed an agreement, and, as in this case, confirmed the agreement in the names given at the child's baptism[,]" ibid., and we extended the presumption to first names as well. Id. at 621 ("The same presumption that the name the custodial parent selects is the one that is in the child's best interest applies whether it is first name or surname name."). Relying on a best interest analysis, we concluded the trial court did not consider the factors set forth in Gubernat in determining which name was in the child's best interest. Ibid.

A-0602-18T3

Finding the name Stefan preserved defendant's heritage, we exercised original jurisdiction and changed the child's name to Christian Stefan Staradumsky. <u>Ibid.</u>

In <u>Emma v. Evans</u>, 215 N.J. 197, 214 (2013), our Court recognized that "[a] name change is a significant event for a child, even for very young children. A name originally given to a child carries a great personal significance[.]" Our Court relied upon a study performed by "a structural-linguistic psychoanalyst on how names are a 'unique form of linguistics linked to human identity formation[.]'" <u>Ibid.</u> (quoting Lisa Kelly, <u>Divining the Deep and Inscrutable: Toward a Gender-Neutral, Child-Centered Approach to Child Name Proceedings</u>, 99 <u>W. Va. L. Rev.</u> 1, 59-60 (1996)).

> Research has shown that "in the real lives of young children names and identity formation are knit together." Thus, under any approach to naming, the importance to a child of his or her name cannot be understated. At bottom, "learning one's name is an important part of the identity formation process, whether that identity is in flux or permanent, public or private."
>
> Accepting the importance of a name given to a child, even a very young child in the process of forming his or her identity through the elemental process of learning his or her name, the decision to alter a child's name is, as noted, a significant moment in a young life.
>
> [<u>Id.</u> at 215 (citations omitted).]

24

When evaluating the best interests of a child, the factors can be broken down into general categories, many of which have been drawn from the Uniform Parentage Act.[9]  Id. at 216.  Each case, however, "should be weighed on its own merits."  Id. at 222.  Our Court held the most important "use of . . . generally recognized factors in these fact-sensitive cases is that the overall impact of the test be child-centered."  Id. at 216.  These factors, many of which were derived from Gubernat, include:

1. The length of time the child has used his or her given surname.

2. Identification of the child with a particular family unit.

3. Potential anxiety, embarrassment, or discomfort that may result from having a different surname from that of the custodial parent.

4. The child's preference if the child is mature enough to express a preference.

. . . .

5. Parental misconduct or neglect, such as a failure to provide support or maintain contact with the child.

---

[9]  The Uniform Parentage Act (UPA) is a uniform statutory scheme for determining a child's legal parentage.  The UPA was first promulgated in 1973 (UPA (1973)).  Courtney G. Joslin, Nurturing Parenthood Through the UPA (2017) 127 Yale L.J.F. 589, 598 (2018).

6. Degree of community respect, or lack thereof, associated with either paternal or maternal name.

7. Improper motivation on the part of the parent seeking the name change.

8. Whether the mother has changed or intends to change her name upon remarriage.

9. Whether the child has a strong relationship with any siblings with different names.

10. Whether the surname as important ties to family heritage or ethnic identity.

11. The effect of a name change on the relationship between each child and each parent.

[Id. at 223.]

Here, the child has used the name Gr.C.W. since his birth, with the exception of what appears on his recent pediatric records. It is unclear from the record what the parties, their families, and friends call the child now or what name he responds to. Moreover, plaintiff only has eleven hours of supervised parenting time with the child weekly, and the vast majority of the child's time is spent in defendant's care. We do not fault the judge for enforcing the consent order because "[s]ettlement agreements in matrimonial matters, being 'essentially consensual and voluntary in character, . . . [are] entitled to considerable weight with respect to their validity and enforceability' in equity,

provided they are fair and just." Dolce v. Dolce, 383 N.J. Super. 11, 20 (App. Div. 2006) (second alteration in original) (quoting Petersen v. Peterson, 85 N.J. 638, 642 (1981)). Such agreements are "encouraged and highly valued in our system." Quinn v. Quinn, 225 N.J. 34, 44 (2016). But the best interests of the parties' child is paramount here, and equity dictates a best interests analysis needs to be conducted, with the assistance of a guardian ad litem, to resolve the dispute over the child's names.

## III.

A guardian ad litem may be appointed by court order "[i]n all cases in which custody or parenting time/visitation is an issue . . . to represent the best interests of the child or children if the circumstances warrant such an appointment." R. 5:8B. The guardian ad litem's basic role "is to assist the court in its determination of the . . . minor's best interest." J.B. v. W.B., 215 N.J. 305, 332 (2013) (quoting Adoption of a Child by E.T., 302 N.J. Super. 533, 539 (App. Div. 1997)). On remand, the trial judge shall appoint a guardian ad litem to assist the court in resolving the dispute at hand.

The trial judge must also consider any misconduct or neglect by the parties in protecting the child's best interest. Hoefers v. Jones, 288 N.J. Super. 590, 607-08 (Ch. Div. 1994). Defendant alleges plaintiff was not interested in

parenting the child and did not want him to know his identity. She claims plaintiff only contested paternity, expressed an interest in spending time with the child, and requested a name change once she sought child support from him. Plaintiff alleges that defendant barred him from the delivery room and refused to let him see the child for weeks, causing him to question paternity. These are salient factual questions to be addressed by the guardian ad litem and the trial judge at a plenary hearing.

Although the parties' divorce has not been finalized, defendant has been using her former surname on court documents since February 2018. She is in a new relationship, but any intention to marry and change her name has not been presented on appeal. Moreover, both parties have children from past relationships using different surnames than this child. These are also issues to be addressed by the guardian ad litem and at the plenary hearing.

As stated in Emma:

> When it comes to changing a surname jointly given to a child at birth, the use of the Gubernat presumption favoring a custodial parent operates on a premise of superior knowledge about the child's best interests. A change in a child's jointly given surname, however, is not akin to daily parenting decisions as to which a primary custodial parent's knowledge of a child is unique. A surname change for a child in such circumstances deserves a searching inquiry into the child's best interests. It is not a step to be taken based

on whim or preference. A child's name ought not to be changed except on good and sufficient reason—the importance of a child's name, as discussed above—requires as much. Thus, a custodial parent, or any other party seeking to change a child's jointly given birth surname, must satisfy the best-interests test.

[215 N.J. at 218.]

Defendant directs our attention to an unpublished Appellate Division case, Repack v. Keavy, No. A-5537-13 (App. Div. June 9, 2015).[10] There, the parties were unmarried and had one child together. Id. at 1. After paternity was established, the father requested to be added to the child's birth certificate, that his last name be added to the child's then current last name, and to be granted joint legal and residential custody. Ibid. After oral argument, the trial court partially granted the father's request, ordering joint legal custody of the child, that he be listed on the birth certificate, and also awarded the mother child support. Ibid. The trial court ordered a best interest of the child evaluation, which recommended that the father's last name be added to the child's name to "help foster her identification with her father." Id. at 2.

---

[10] Unpublished opinions are not binding on any court and should not be relied upon for precedential authority. Pressler & Verniero, Current N.J. Court Rules, cmt. 2 on R. 1:36-3 (2019). "Although the parties may bring unpublished opinions to the attention of the court, the court itself may not cite an unpublished opinion except to the limited extent required by the application of preclusionary legal principals or case history." Ibid.

The parties submitted briefs on the issue, but the court cancelled the hearing and issued an order and statement of reasons requiring the mother to include the father's name, named both parties joint residential and legal custodians, and set a parenting schedule. Ibid. We reversed the determination on the addition of the father's surname because the trial court incorrectly stated that Emma abandoned the Gubernat rebuttable presumption in favor of the custodial parent's preference of last name. Id. at 14. The facts there were similar to Gubernat, in that the parties did not agree upon a name for the child. Ibid. We also held that the custodial parent, the mother, should have been "entitled to a heavy presumption in favor of the name she chose for the child." Id. at 15. Repack is distinguishable. Similar to Emma, the parties agreed upon a name for their child, and defendant's name preference is not entitled to the presumption set forth in Gubernat.

IV.

Finally, N.J.A.C. 8:2-1.4(a) provides that "[t]he designation of a child's name including the surname is the right of the child's parent(s)."

> 1. Where either parent is unavailable for any reason, the choice of the child's name(s) rests with the parent who has custody of the newborn child. That parent shall state in writing on the back of the birth record that the other parent is not available; thereafter the recording parent shall be the sole informant for the purpose of

A-0602-18T3

compliance with N.J.S.A. 26:8-26[11] and this subchapter.

2. In cases where both parents have custody of the child, and both are available, and disagree on the selection of a surname, the surname selected by one parent and the surname selected by the other parent shall both be entered on the certificate, separated by a hyphen, with the selected names entered in alphabetical order.

[N.J.A.C. 8:2-1.4(a)(1) to (2).]

The State Administrative Code also provides, "[i]f the birthing parent is married at the time of the birth . . . the spouse's name shall be listed on the birth record unless the spouse denies parentage and both the husband and wife agree and acknowledge the denial in writing on the Affidavit of Denial of Paternity form." N.J.A.C. 8:2-1.5(b). Plaintiff was not present at the child's birth. There are conflicting certifications regarding the circumstances which prevented him from being present—plaintiff claims defendant barred him from the delivery room, and defendant contends he was notified and did not appear—and defendant also claims that plaintiff denied paternity.

---

[11] N.J.S.A. 36:8-26 requires each subregistrar to note the date of filing on every birth or death certificate, and to forward all certificates to the local registrar of the district within five days.

A-0602-18T3

"A plenary hearing is required when the submissions show there is a genuine and substantial factual dispute regarding the welfare of the child[.]" Hand v. Hand, 391 N.J. Super. 102, 105 (App. Div. 2007). "[I]t is well[-]settled that the court's primary consideration is the best interests of the child[]" in custody and visitation determinations. Ibid. A decision made "without examination and cross-examination of lay and expert witnesses, and without a statement of reasons is untenable in the extreme." Fusco v. Fusco, 186 N.J. Super. 321, 327 (App. Div. 1982).

In sum, we reverse and vacate the August 29, 2018 final judgment of name change. On remand, the trial judge shall appoint a guardian ad litem to determine the best interest of the child as to his names and a plenary hearing shall be conducted on this issue. We find the other arguments advanced by the parties lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Reversed, vacated, and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION